s:\appeal\lindsayi.brief

GENOVA & MALIN
Attorneys for Appellant
Hampton Business Center
1136 Route 9
Wappingers Falls NY 12590
(845) 298-1600
Thomas Genova (TG4706)
Andrea B. Malin (AM4424)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
In Re:

            SHELTON LINDSAY,

                             Debtor.

                        Bankruptcy Court
                        Case No. 06-36352 (CGM)
                        (Chapter 7)

------------------------------------------------------x
SHELTON LINDSAY,

                        Appellant,

     - against -

LEE S. KALISH,

                        Appellee.

                        **HON. GEORGE A. YANTHIS**

                        District Court
                        Civil Docket
                        Case No. 7:08-cv-01326

------------------------------------------------------x

**ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------------------------------------

**BRIEF FOR DEBTOR-APPELLANT**

--------------------------------------------------------------------------------------------------------------

                        GENOVA & MALIN
                        Attorneys for Debtor-Appellant

          By:    /s/ Thomas Genova
                        THOMAS GENOVA, ESQ. (TG4424)
                        Hampton Business Center
                        1136 Route 9
                        Wappingers Falls NY 12590
                        (845) 298-1600

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... I

TABLE OF STATUTES ........................................................ ii

PRELIMINARY STATEMENT ............................................. 1

JURISDICTION STATEMENT ............................................ 1

ISSUE PRESENTED ........................................................... 1,2

STANDARD OF REVIEW ................................................... 2

STATEMENT OF THE CASE ............................................... 2,3

STATEMENT OF FACTS .................................................... 3-8

SUMMARY ......................................................................... 8

ARGUMENT:

    THE BANKRUPTCY COURT ERRED IN ITS LEGAL INTERPRETATION THAT THE ELEMENTS REQUIRED FOR A FINDING THAT A DEBTOR VIOLATED 11 U.S.C. §523(a)(6) ARE IDENTICAL TO THE ELEMENTS UNDER NEW YORK JUDICIARY LAW FOR A FINDING OF CONTEMPT........................................................................... 9-16

CONCLUSION ................................................................... 16

## TABLE OF AUTHORITIES

In re Akhtar, 368 B.R. 120 (B.Ct.E.D.N.Y. 2007)..................................... 14

In re Blankfort, 217 B.R. 138 (B.Ct.S.D.N.Y. 1998)................................ 14

In re Bulter, 297 B.R. 741 (B.Ct.Ill. 2003)................................................. 9, 10, 14

In re Carlson, 224 B.R. 659 (B.Ct.N.d.Ill 1998)
     aff'd, 2001 WL 1313652 (7th Cir. 2001)........................................ 9

In re Cox, 243 B.R. 713 (B.Ct.N.D.Ill 2000).............................................. 9

In re Geiger,  118 S.Ct. 974 (1998)............................................................ 9, 10

Grogan v. Garner, 498 U.S. 279 (1991).................................................... 9, 10

In re Hyman, 2007 WL 2492789 (2d Cir.)................................................... 9, 11-15

In re Ker, 365 B.R. 807 (B.Ct. S.D.Ohio 2007)........................................ 14

In re Kidd, 219 B.R. 278 (B.Ct.Montana 1998)........................................ 9, 10

In re Markowitz, 190 F.3d 455 (6th Cir. 1999)......................................... 9

Meyer v. Rigdom, 36 F.3d 1375 (7th Cir. 1994)........................................ 11

In re Miller, 156 F.3d 598 (5th Cir. 1998)................................................. 9,10

In re Slosberg, 225 B.R. 9 (B.Ct.D.Me. 1998).......................................... 9, 10

In re Strauss, 2006 WL 2583645 (B.Ct.S.D.N.Y.)................................... 14

In re Thirtyacre, 36 F.3d 697 (7th Cir. 1994)............................................. 10

## <u>TABLE OF STATUTES</u>

28 U.S.C. §§158(a) and 157 ....................................................................  1

11 U.S.C. §523(a)(6).............................................................................. 1, 6-11, 13-15

NY Judiciary Law §753(A)(3)................................................................. 2, 7, 13

GENOVA & MALIN
Attorneys for Appellant
Hampton Business Center
1136 Route 9
Wappingers Falls NY 12590
(845) 298-1600
Thomas Genova (TG4706)
Andrea B. Malin (AM4424)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
IN RE:                                                      **CHAPTER 7**

SHELTON C. LINDSAY,                                         **CASE NO.: 06-36352(CGM)**

                    Debtor.
------------------------------------------------------x
SHELTON C. LINDSAY,
                                                            **HON. GEORGE A. YANTHIS**
                    Appellant,
                                                            District Court
                                                            Civil Docket
        - against -                                         Case No. 7:08-cv-01326

LEE S. KALISH,

                    Appellee.
------------------------------------------------------x

## APPELLANT'S BRIEF

## PRELIMINARY STATEMENT

        This brief is submitted on behalf of the Debtor-Appellant, SHELTON C. LINDSAY,

in appeal from the holding of the United States Bankruptcy Court, Southern District of New York,

Poughkeepsie, New York, entered on January 2, 2008 and the Court's Decision entered on January

7, 2008, granting to the Appellee, LEE S. KALISH summary judgment on the issue of the non-

dischargeability of a debt under 11 U.S.C. §523(a)(6).

## JURISDICTION STATEMENT

        This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 158(a) and 157.

## ISSUE PRESENTED

        Did the United States Bankruptcy Court err in its holding that the elements necessary

to find that a debt is non-dischargeable under 11 U.S.C. §523(a)(6) are identical to the elements

necessary to find a party in contempt under New York Judiciary Law §753(A)(3)?

## STANDARD OF REVIEW

In reviewing ruling of the United States Bankruptcy Court, Southern District of New York, Poughkeepsie Division's ruling the standard for this Court is <u>de novo</u> review.

## STATEMENT OF THE CASE

The Appellant, SHELTON C. LINDSAY (the "debtor"), is appealing from the Decision and Order of the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Court"), rendered by the United States Bankruptcy Court on January 7, 2008, holding that a state court judgment for contempt collaterally estopped the debtor from litigating whether the debt due and owing to the appellee was non-dischargeable under 11 U.S.C. §523(a)(6).

Prior to the filing of the debtor's petition under Chapter 7 of the United States Bankruptcy Code, the Dutchess County Supreme Court entered an Order finding debtor in contempt under New York Judiciary Law §753(A)(3) of a previously entered order and awarding to the appellee damages.

On December 8, 2006, the debtor filed a petition under Chapter 7 of the United States Bankruptcy Code. On May 7, 2007, the appellee filed a complaint against the debtor alleging, among other things, that the debt represented by the Contempt Judgment was non-dischargeable under 11 U.S.C. §523(a)(6) and that the debtor was collaterally estopped by the Supreme Court's finding of contempt from litigating same.

On June 22, 2007, the debtor filed an answer to the complaint.

On August 17, 2007, the appellee filed a Motion for Summary Judgment, regarding the issues of non-dischargeability arising under 11 U.S.C. §523(a)(6).

On October 2, 2007, the debtor filed opposition thereto.

On January 2, 2008, the United States Bankruptcy Court entered an Order Granting to the appellee Summary Judgment finding that the debtor was collaterally estopped from litigating the elements of 11 U.S.C. §523(a)(6), as same had already been fully litigated by the parties in the

2

Dutchess County Supreme Court action, as the elements set forth in New York Judiciary Law §753(A)(3) regarding contempt are identical to the elements under 11 U.S.C. §523(a)(6).    The Bankruptcy Court filed its Decision supporting the Order of January 2, 2008 on January 7, 2008.

On January 7, 2008, the debtor filed his Notice of Appeal.  On January 16, 2008, the Designation of Content and Issues on Appeal was filed.  On January 24, 2008, the appellee filed his Counter-Designation of Content and Issues on Appeal.

## **STATEMENT OF FACTS**

Prior to said filing Lindsay had operated, as a fifty (50%) shareholder, a company known as Rock City Sound, Inc.(RCS).  The remaining partner of the RCS stock was owned by the appellee herein Lee Kalish ("Kalish").

## KALISH'S RESIGNATION

Kalish submitted his withdrawal notice of his officership and directorship of Rock City Sound, Inc. ("RCS") on February 20, 2004 leaving Shelton Lindsay ("Lindsay") thereafter to operate the company.    Pursuant to the Corporate Governance Agreements of the Company, Kalish sought a buy out shares of his stock.  The purchase price of the stock tendered by RCS, according to its calculations based upon the corporate by-laws and shareholder agreement, was $897,275.00. Kalish claims the correct value of his shares was $1,145,580.00.[1]  This dispute led directly to the impasse between the shareholders, the resulting state court litigation between them and ultimately the bankruptcy filing.

Subsequent to the withdrawal from RCS by Kalish, Lindsay was its sole officer and director.  Kalish sought certain restrictions on the business operations of the company in state court litigation and was unsuccessful in obtaining same.  The Shareholder Agreement and by-laws of the

---

[1]    The parties were in dispute with regard to which three (3) year fiscal period should be employed to calculate the buy-out amount.  The dispute arose as the appellee's resignation was tendered in February, 2003, but not effective until August, 2003, which was the ending fiscal year for the corporation.  RCS determined its figure ($897,275.00) using the three (3) fiscal years prior to the tender of the appellee's resignation.  Appellee calculated his figure ($1,145,000.00) using the three (3) fiscal years prior to his retirement date.   The by-laws are silent on this issue.

company granted to the remaining shareholder the authority to conduct business and same was confirmed by the Court in said state court litigation. Furthermore, special meetings of the shareholders could be and were called by the Board after the withdrawal from the company by Kalish. After Kalish's departure, the company continued to exist and operate, maintained employees and conducted its business.

<u>STOCK VALUATION ISSUES</u>

The value established by RCS for the Kalish shares was fixed based upon the calculations of Robert Cranston, CPA and long time accountant to the corporation, in accordance with the corporate agreements. Robert Cranston, as controller and accountant to the company, issued a letter on August 13, 2004, in a manner in accordance with the Shareholder Agreement, which set forth the value of the Kalish shares using the three (3) year averaging method as set forth in the Shareholder Agreement. It was and is the position of Lindsay that this is in accordance with the Shareholder Agreement was the correct methodology for calculation of value. Lindsay appeared at the closing tendered the down payment, an amount in excess of $224,000.00, plus an additional promissory note in the amount of $672,956.25 and related documents, all in accordance with the Shareholder Agreement. Kalish, who paid no consideration or investment for his shares, refused to attend and accept said funds or close the transaction. Specifically, the Shareholder Agreement, at paragraph 12, sets forth as follows:

> **12. Failure to Comply With Six-Month Notice Requirement.** In the event a Shareholder shall desire to withdraw from his active participation in the Corporation and such Shareholder shall either (I) fail to give the six (6) months' advance written notice required by Section 2(a) of this Agreement, or (ii) withdraw from his participation in the Corporation's business prior to the Withdrawal Date, then upon the occurrence of either of such events (A) the Withdrawing Shareholder shall automatically be deemed to have (x) tendered his resignation from his positions as an officer and a director of the Corporation, and (y) given a proxy to the Remaining Shareholder authorizing the Remaining Shareholder to vote all of the Withdrawing Shareholder's Shares in such manner as the Remaining Shareholder shall in his sole and absolute discretion deem advisable with respect to all matters as to which the Corporation's shareholders are entitled or required to act, and (B) neither the Corporation nor the Remaining Shareholder shall be under any obligation to purchase the Withdrawing Shareholder's Shares as provided in Section 2 hereof (it being understood, however, that the Corporation and the Remaining Shareholder shall retain the right to elect to purchase such shares in accordance with the terms

4

and procedures set forth in Section 2 hereof).  In addition, upon the occurrence of either of the foregoing events, the Withdrawing Shareholder shall not be permitted to dispose of any of his Shares prior to the Withdrawal date, nor may the Withdrawing Shareholder sell his Shares to any third parties subsequent to the Withdrawal date unless he shall first give the Corporation and the Remaining Shareholders an opportunity to purchase such Shares in compliance with the terms and procedures set forth in Section 5 hereof.  Anything to the foregoing notwithstanding, the parties agree that the Withdrawing Shareholder shall have the right to request that the six (6) month notice period be waived or shortened.  Should the Remaining Shareholder agree to waive or shorten such notice period, he shall deliver a written consent (the "Consent") to his waiver or shortening of the six (6) month notice period to the Withdrawing Shareholder, which Consent shall recite the date (the "Early Withdrawal Date") on which the Remaining Shareholder agrees to permit the Withdrawing Shareholder to withdraw from the Corporation without triggering the provisions of this Section 12.  In the event the Remaining Shareholder agrees to so waive or shorten the six (6) month notice period, the provisions of Section 2 hereof shall remain in full force and effect, except that all references therein to the "Withdrawal Date" shall be deemed to be references to the Early Withdrawal Date as set forth in the Remaining Shareholder's Consent."

## POST RESIGNATION ACTIONS

The State Court order in no way enjoined the company from the acquisition or sale of inventory, machinery, or equipment.  Additionally, as Kalish had resigned effective August 20, 2004, Lindsay was left as the sole remaining shareholder. In or about July of 2005, RCS sold, to a used equipment broker of impeccable reputation, certain of its sound equipment, office equipment and other goods.  Said purchaser, H.T.I.C.S., was introduced to the company by Kalish himself.  The sales price was carefully considered by RCS taking into consideration the age, condition and functionality of the equipment sold.  The company contacted other potential purchasers and was satisfied that the transaction with H.T.I.C.S. was the best available. Subsequent to the asset sale to H.T.I.C.S., the company retained assets valued in excess of $1,600,000.00.

The actions of Lindsay during the wind down of the RCS corporate affairs was undertaken in a fiduciary capacity by Lindsay.  All actions of Lindsay were undertaken to protect the company its remaining employees and its creditors.  It must be noted that the proceeds of the H.T.I.C.S. equipment sale were used to satisfy corporate obligations of RCS where Kalish maintained a personal guarantee and the use of the proceeds to satisfy these obligations discharged

5

Kalish's guarantee thereon.  In addition, the issue of the remaining unsold equipment, valued in excess of $1,600,000, must not be disregarded in a litigation where Kalish is alleging a breach of a fiduciary duty by Lindsay.  In more than twenty-five (25) separate contacts, both telephonic and by correspondence, to Kalish and counsel, RCS unsuccessfully sought to sell the remaining inventory for the benefit of the company and its shareholders, as it was Kalish who had withdrawn from the company and Kalish who refused to attend the closing and be paid a sum in excess of $897,000 for shares of stock for which he neither paid consideration nor made an investment.  RCS determined that Kalish was in violation of the Shareholder Agreement, specifically at Paragraph 12 thereof,  for his failure to close in compliance with the six month notice requirement set forth therein.  Given the appellant's medical condition of active Hep C, a liver transplant, a liver rejection and his desire not to abandon this business he had founded some thirty (30) years earlier, appellant was put in a difficult position of a winding down a previously profitable business.

The proceeds from the sales of the assets which were liquidated were used to satisfy corporate liabilities including the satisfaction in full of a substantial corporate liability to Rhinebeck Savings Bank upon which both plaintiff and defendant  were personally liable.  It is clear from this single act that plaintiff's burden  pursuant to 11 U.S.C. §523(a)(6), can not be met.

<u>STATE COURT ACTION</u>

Prior to the filing of the debtor's petition in bankruptcy, the appellee herein commenced a cause of action against the debtor in the Dutchess County Supreme Court entitled: *LEE S. KALISH v. SHELTON C. LINDSAY and ROCK CITY SOUND, INC., Index No. 4088/04.*  The basis of the action was that plaintiff sought an Order for Specific Performance of the parties' shareholder agreement.

On or about December 10, 2004, the Dutchess County Supreme Court entered an Order granting certain Injunctive Relief with regard to the exercise of dominion and control over the corporate assets at issue.  Thereafter , a dispute with regard to the interpretation of the court's restraining order arose between the parties which resulted in the plaintiff, therein, filing a Motion

for Contempt against the debtor.

On August 11, 2006, the Dutchess County Supreme Court entered an Order finding that the debtor was in Contempt of the Court's December 10, 2004 Order pursuant to New York Judiciary Law §753(A)(3) awarded to the appellee damages.

## FILING UNDER CHAPTER 7 OF THE UNITED STATES BANKRUPTCY CODE

On December 8, 2006, the debtor filed a voluntary petition for Bankruptcy under Chapter 7 of the Bankruptcy Code. The debtor listed the debt owed to the appellee on Schedule F filed with his petition.

On May 7, 2007, the appellee commenced an adversary proceeding against the debtor, alleging, amongst other things, that the debt owed to the appellee arising from the damages awarded by the DUtchess County Supreme Court in its Contempt Order entered against the debtor on August 11, 2006 was non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). On June 22, 2007, the debtor filed an answer to the complaint.

On August 17, 2007 , the appellee filed a Motion for Summary Judgment seeking to have the debtor collaterally estopped form litigating the claim under 11 U.S.C. §523(a)(60 as same had already been decided by the Dutchess County Supreme Court and embodied in its Contempt Order. On October 2, 2007, the debtor filed opposiotn thereto.

On January 2, 2008, the United States Bankruptcy Court entered an Order granting Summary Judgment in favor of appellee. On January 7, 2008, the United States Bankruptcy Court entered its decision in favor of the appellee finding that the debtor was estopped from litigating the issues under 11 U.S.C. §523(a)(6) as the elements required to demonstrate contempt under New York Judiciary Law §753 were identical to the elements that are required for a finding under 11 U.S.C. §523(a)(6).

On January 7, 2008, the debtor filed a Notice of Appeal. On January 16, 2008, the debtor filed a Designation fo Contents and Issues on Appeal. On January 24, 2008, the appellee filed a Counter Designation of Contents and Issues on Appeal.

7

On February 11, 2008, the appeal was docketed with this Court and the debtor's Appeal Brief is to be filed and served on or before February 29, 2008. The appellee's Appeal Brief must be filed and served within fifteen (15) days thereof.

## SUMMARY

The Appellant is appealing from the Order of the United States Bankruptcy Court of the Southern District of New York, entered after a decision on the appellee's Motion for Summary Judgment rendered by the United States Bankruptcy Court on January 2, 2008, finding that the debtor was collaterally estopped from litigating the issues under 11 U.S.C. §523(a)(6). The crux of the debtor's argument is that the Bankruptcy Court erred in finding that the elements necessary to find that a party is in contempt under New York Judiciary Law §523(A)(3) were identical to the elements that must be necessarily proven to find that a debt is non-dischargeable under 11 U.S.C. §523(a)(6).

The debtor will set forth its argument for reversal of the decision of the United States Bankruptcy Court, Southern District of New York, Poughkeepsie Division, as set forth herein under Argument portion of the debtor/Appellant's Brief:

**The debtor is not collaterally estopped by the State Court's Contempt finding entered against the debtor by the Supreme Court, State of New York, Dutchess County entitled LEE S. KALISH v. SHELTON LINDSAY and ROCK CITY SOUND, INC., bearing Index No. 4088/2004 (the "state court litigation") entitling the appellee to summary judgment on the issue of the dischargeability of the debt under 11 U.S.C. §523(a)(6), as the elements required for findings under the two (2) statutes are not identical and thus were not fully litigated in the State Court Action. Therefore, same should not be given collateral estoppel effect.**

8

## ARGUMENT

### THE BANKRUPTCY COURT ERRED IN ITS DETERMINATION THAT THE DEBTOR WAS COLLATERALLY ESTOPPED FROM LITIGATING THE ISSUES UNDER 11 U.S.C. §523(a)(6)

It is clear from the facts as set forth herein that the Contempt Order entered in the state court litigation does not collaterally estopp the debtor on the issue of nondischargability pursuant to 11 U.S.C. §523(a)(6).  11 U.S.C. §523(a)(6).  In re Geiger,  118 S.Ct. 974 (1998); In In re Carlson, 224 B.R. 659 (B.Ct.N.d.Ill 1998), aff'd, 2001 WL 1313652 (7th Cir. 2001);  In re Hyman, 2007 WL 2492789 (2d Cir.); In re Bulter, 297 B.R. 741 (B.Ct.Ill. 2003);  In re Markowitz, 190 F.3d 455 (6th Cir. 1999);  In re Cox, 243 B.R. 713 (B.Ct.N.D.Ill 2000);  In re Kidd, 219 B.R. 278 (B.Ct.Montana 1998); In re Slosberg, 225 B.R. 9 (B.Ct.D.Me. 1998); In re Thirtyacre, 36 F.3d 697 (7th Cir. 1994);  In re Miller, 156 F.3d 598 (5th Cir. 1998); and Grogan v. Garner, 498 U.S. 279 (1991).

Section 11 U.S.C. §523(a) enumerates a list of debts from which the debtor will not receive a discharge pursuant to 11 U.S.C. §727.  11 U.S.C. §523(a)(6) states:

(a)     A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt –

(6)     for willful and malicious injury by the debtor to another entity or to the property of another entity.

In order for the plaintiff to be entitled to a determination of nondischargability under 11 U.S.C. §523(a)(6), the plaintiff must demonstrate to this court by a preponderance of the evidence, the following elements:   "(1)   That the defendant caused an injury; (2)   That the defendant's actions were willful, and (3) that the defendant's actions were malicious." In re Butler, supra. at 746.  (See also, In re Carlson, 224 B.R. 659 (B.Ct.N.d.Ill 1998), aff'd, 2001 WL 1313652 (7th Cir. 2001)).   The standard to be employed when making a determination as to the dischargeability of a debt under 11 U.S.C. §523(a)(6) is set forth in the case of In re Geiger, supra. In Geiger, the Supreme Court of the United States addressed the issue as to what acts fall within the

9

purview of 11 U.S.C. 523(a)(6). In considering this pivotal issue, the Supreme Court found that in order for an act to be exempted from discharge as "willful" under 11 U.S.C. §523(a)(6) the actor must have acted with the actual intent to cause harm, not merely engage in an intentional act that leads to an injury. Id. Thus, in order for the plaintiff to satisfy the element of "willful," plaintiff must show that the debtor **actually intended to harm the plaintiff by his actions which were classified as contempt by the state court; and not merely that the defendant acted intentionally resulting in harm to the plaintiff. [emphasis added].** Id.

However, the Supreme Court did not wholly define the scope of the term "intent" which it employed to describe willful conduct. In re Butler, supra. "Subsequent decisions, however, have required either showing of subjective intent to injure the creditor or a showing of a debtor's subjective knowledge that injury is substantially certain to result from his acts to establish the intent required in Geiger, supra." Id. at 747. (See also: In re Markowitz, 190 F.3d 455 (6th Cir. 1999); In re Cox, 243 B.R. 713 (B.Ct.N.D.Ill 2000); In re Kidd, 219 B.R. 278 (B.Ct.Montana 1998)).

Secondly, in order to establish the element of "malice," "a creditor must show that the debtor's willful, injurious conduct was undertaken without just cause or excuse.' Id. at 747 (See also: In re Slosberg, 225 B.R. 9 (B.Ct.D.Me. 1998); In re Thirtyacre, 36 F.3d 697 (7th Cir. 1994)).

The standard as set forth in In re Geiger, supra., has been further considered in the case of In re Miller, 156 F.3d 598 (5th Cir. 1998). In the case of In re Miller, supra., the Court considered the issue of whether under the guidelines set by the Supreme Court in Geiger malice could be implied under 11 U.S.C. §523(a)(6). The Court answered this question in the affirmative holding that under 11 U.S.C. §523(a)(6) an injury is "'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." Id. at 9.

It is clear that the doctrine of collateral estoppel (issue preclusion) applies to adversary proceedings brought before the Bankruptcy Court under 11 U.S.C. §523(a). Grogan v. Garner, 498 U.S. 279 (1991). Pursuant to this doctrine, a party may not re-litigate issues in the bankruptcy court

that have bee determined in a prior state court proceeding.  Id..  However, **the bankruptcy court has exclusive jurisdiction to determine the dischargeability of the debts under 11 U.S.C. §523(a)(6). [emphasis added].**  In re Butler, supra.  In order for the plaintiff to collaterally estopp the debtor from litigating the claim under 11 U.S.C. §523(a)(6), plaintiff must demonstrate the following elements:

> 1.  The issue sought to be precluded must be the same as that involved in the prior litigation;
>
> 2.  The issue must have been actually litigated;
>
> 3.  The determination of the issue must have been essential to the final judgment; and
>
> 4.  The party against whom estoppel is invoked must be fully represented in the prior action.

Meyer v. Rigdom, 36 F.3d 1375, 1379 (7th Cir. 1994).

The Second Circuit has been clear in its mandate that the doctrine of collateral estoppel is not to be mechanically applied by bankruptcy courts in cases involving determinations to be made as to whether a state court judgment should be given preclusive effect in actions under 11 U.S.C. §523(a) that are withing the sole jurisdiction of the bankruptcy court. In re Hyman, 2007 WL 2492789 (2d Cir.).  In so finding, that Court held :  "'Collateral estoppel, is a flexible doctrine, should not be mechanically applied just because some of its formal prerequisites, like identity of the parties, identity of issues, a final and valid prior judgment and a full and fair opportunity to litigate the prior determination, may be present." Id. at 7.

The state court order at issue in this case is the "Order of Civil Contempt" entered against the debtor by the Dutchess County Supreme Court in state court litigation between the parties. Said Order found the debtor liable for civil contempt and awarded damages to the plaintiff.  A judgment was thereupon entered which the plaintiff now seeks to have this Court find that the Civil Contempt Order upon which said judgment was based collaterally estopps the debtor from litigating the issues under 11 U.S.C. §523(a)(6).

The underlying state court litigation was instituted by the plaintiff who sought to

11

obtain specific performance from the debtor of a shareholder's agreement for the disposition of the plaintiff's shares of ROCK CITY SOUND, INC., based upon plaintiff's withdrawal as a shareholder. State Court Order is Annexed as Exhibit "A" to the Motion for Summary Judgment).   During the pendency of the litigation the plaintiff moved for the entry of an Order granting to him, amongst other things, partial summary judgment awarding to the plaintiff a security interest in his stock and possession of same by the plaintiff's agent until such time as the state court could determine the amount of the purchase price of the stock and the sale of same was completed. (State Court Decision, p. 2).  On April 20, 2005, the state court granted plaintiff's motion and an Order to that effect was entered by the state court on May 25, 2005. Id. at pp. 2-3.

> The May 25, 2005 Order of the state court specifically provided, in pertinent part:
>
> Applying these principals to the submission of the parties herein, this Court first notes defendants agree that an injunction restraining the disposition of the corporate shares owned by plaintiff is proper. Therefore, based upon this consent, plaintiff is granted preliminary injunction enjoining defendant, their principals, agent and assigns, and any person acting in concert with them from exercising any dominion or control over, committing any act upon and or effectuating any dominion or control over, committing any act upon and/or effectuating any conveyance transfer, assignment or encumbrance, sale or disposing of plaintiff's sixty shares in ROCK CITY SOUND, INC. Pending the resolution of this action.

As is the norm, prior to the commencement of the state court litigation, the corporation had incurred and continued to incur debt for which both the plaintiff and the debtor were personally responsible . The fact that plaintiff desired to have the corporation purchase his share interest did not effect a stay on daily corporate realities.  Instead, the debtor was left with the task of continuing to operate the corporation and pay its debts.  Given the defendant's severe medical condition, to wit: his diagnoses of active Hep C, liver rejection, diabetic episodes, dangerously low white blood cell counts, and the fact that he was required to undergo Pegylated Interferon and Ribavirin treatment due to the fibrosis in his liver and requires a liver transplant, his desire not to abandon the business he had founded some thirty (30) years earlier put defendant  in this difficult position of winding down a previously profitable business enterprise.  Thus, after the entry of the Order on May 25, 2005, the

debtor continued operating same.  As the plaintiff failed or refused to participate in the daily operation of the business, the debtor, upon the advice of counsel, held a regular business meeting and decided at that meeting to vote the plaintiff's shares to enable the corporation to liquidate certain assets to satisfy certain corporate liabilities.  The proceeds from the sales of the assets which were liquidated were used to satisfy corporate liabilities including the satisfaction in full of a corporate liability to Rhinebeck Savings Bank upon which both plaintiff and defendant were personally liable. It is clear from this single act that plaintiff's burden pursuant to 11 U.S.C. §523(a)(6), can not be met.

Thereafter, the plaintiff filed with the state court a Motion to hold the debtor and his attorneys in contempt of the preliminary restraining order.

Pursuant to New York Judiciary Law §753(A)(3),

a court is authorized to punish a person for civil contempt when it finds that person to be in disobedience of a lawful mandate of the Court as the result of the following four requirements having been met.

1.  A clear and unequivocal order must exist;

2.   The party to be held in contempt must have knowledge of the order;

3.   With reasonable certainty, it must appear that the order was violated; and

4.   The violation must have defeated, impaired, impeded or prejudiced a right or remedy of a party to the action.

(See also pp.4-5 of the State Court Order).  Considering these factors, the state court found each of the factors to exist and entered a contempt order with damages against the debtor, but refused to find same against debtor's counsel based upon the advice same had given to the debtor.   As is clear from even a preliminary review of the factors set forth in the Judiciary Law, a finding of civil contempt does not require the state court to consider or make a finding as to the debtor's intent with regard to the conduct found to have violated the order.  The court need only find that the debtor knew the order existed and that the action in which the debtor engaged, violated the order.

Several courts have addressed the issue of when to apply the doctrine of collateral

13

estoppel with regard to issues decided by a state court and set forth in an order in adversary proceedings commenced under 11 U.S.C. §523(a). In re Hyman, supra. (State court order that plaintiff sought to employ to preclude the debtor on the elements under 11 U.S.C. §523(a)(4) akin to the intentional and malicious requirements of 523(a)(6) was insufficient to base a motion for summary judgment as the lower court did not "specifically" address the issue of "intent" and "bad conduct."); In re Butler, supra. (state court order which found that the debtor's continued violation of a "not to compete clause," after repeated warning, supported a finding of "intentional" and "malicious" under 11 U.S.C. §523(a)(6)) ; In re Strauss, 2006 WL 2583645 (B.Ct.S.D.N.Y.) (court precluded husband who continually violated state court's orders restraining the disposition of marital property in the parties' divorce action supported the application of issue preclusion as to debtor's "intent."); In re Akhtar, 368 B.R. 120 (B.Ct.E.D.N.Y. 2007) (court found applied issue preclusion on the issue of intent due to the debtor's repeated violations of the restraining order entered by the district court as the Order entered by the district court made it clear that the district court gave "careful consideration to whether the Debtor's conduct was 'wrongful' and 'without just cause or excuse." Id. at 132); In re Ker, 365 B.R. 807 (B.Ct. S.D.Ohio 2007) (the court applied the doctrine of collateral estoppel of the matrimonial court's findings that specifically considered the bad conduct of the debtor); In re Blankfort, 217 B.R. 138 (B.Ct.S.D.N.Y. 1998) (the court found that the debtor was precluded on the issues regarding 11 U.S.C. §523(a) arising from the debtor's continued trade mark violation despite specific warnings to discontinue said conduct.)

A review of the cases of In re Strauss, In re Ker, and In re Blankfort, quickly demonstrates that the findings in these case are clearly inapposite to the case at bar. In each one of the cases, the lower courts addressed the issue of the debtor's intentional and malicious conduct based upon their continued violations of the orders set forth therein.

Of the cases cited, the findings that are most on point, are the cases of In re Hyman, supra. and In re Akhtar, supra. In the case of In re Hyman, supra., the Second Circuit Court of Appeals addressed the issue of whether a Surrogate Court's finding that the debtor had breached his

fiduciary duty was sufficient to preclude the debtor from litigating the issue of defalcation in the bankruptcy court under 11 U.S.C. §523(a)(4). In considering the issue, the Court refused to give the Surrogate Court's finding preclusive effect by mechanically applying the doctrine of collateral estoppel, as the Surrogate Court's Order did not specifically address all of the elements necessary for the Court to base a finding against the debtor that he violated 11 U.S.C. §523(a)(4). Id. Most importantly, the Surrogate Court **"made no express findings with regard to Hyman's state of mind. We assume that the Surrogate concluded that under New York Law such findings were not necessary, since misappropriation and breach of fiduciary duties apparently do not, under New York law, consistently require proof of a culpable mental state." [emphasis added]**. Id. at 6. **By requiring the courts to make appropriate findings of conscious misbehavior or recklessness in the course of dischargeability litigation, the stand we adopt today insures that the harsh sanction of non-dischargeability is reserved for those who exhibit 'some portion of misconduct." [emphasis added]**. Id. at 6-7. The case of Akhtar, supra., although decided prior to Hyman, supra., obviously adheres to the same principle as it allowed the application of the doctrine of collateral estoppel only because the district court's order was clear that it had specifically addressed all of the elements necessary to find that the debt to be non-dischargeable under 11 U.S.C. §523(a)(6). Furthermore, the Court in Hyman encourages, if not requires, the bankruptcy courts to review the underlying state court record to determine if the state court appropriately considered the debtor's "state of mind." Id. at 7.

In applying these principles to the present case, it is easy to conclude that the elements necessary for a finding of contempt under state law do not include the necessity to make specific findings as to the party's "bad conduct" or "intentional conduct" as does a finding under 11 U.S.C. §523(a)(6). The New York Judiciary law merely requires the state court to make a finding that the debtor "knew" the order existed, not that he intentionally engaged in conduct for the specific purpose of violation the order and injuring the debtor. As in Hyman, the mere fact that the debtor's conduct may have been determined to be "self serving" by the state court, this is insufficient to base a finding

15

that the requisite intent was present to find the debt non-dischargeable under 11 U.S.C. §523(a).  Id.

Lastly, the state court contempt order does not address of injury caused by the debtors' "intentional and malicious " conduct.  The Order simply concludes, without any justification or evidence, that the debtor acted :"knowingly," the debtor's acts "violated" the order and thus the plaintiff was injured in the amount that one of the parties asserted was the entire value of the stock.

Accordingly, as the state court contempt order does not specifically address the debtor's "state of mind" or the issue of "injury," the plaintiff should not be granted summary judgment based upon the doctrine of collateral estoppel.  Id.

## CONCLUSION

For all of the foregoing reasons, this Court should reverse the Decision entered on by the United States Bankruptcy Court, Southern District of New York, Poughkeepsie Division; and grant to the debtor such other and further relief as this Court deems proper.

Dated:  Wappingers Falls, New York
        February 29, 2008

GENOVA & MALIN
Attorneys for the Debtor/Appellant

By:    /s/ Thomas Genova
       THOMAS GENOVA (TG4706)
       Hampton Business Center
       1136 Route 9
       Wappingers Falls, New York 12590
       (845) 298-1600

16

219 B.R. 278
219 B.R. 278
**(Cite as: 219 B.R. 278)**

**C**
In re Kidd
Bkrtcy.D.Mont.,1998.

United States Bankruptcy Court,D. Montana.
In re Robert W. KIDD, Debtor.
AVCO FINANCIAL SERVICES OF BILLINGS,
Plaintiff,
v.
Robert W. KIDD, Defendant.
**Bankruptcy No. 97-42053-7.**
**Adversary No. 97/00102.**

March 23, 1998.

Creditor brought adversary proceeding to except debt from discharge as one for credit obtained by debtor's materially false statement in writing regarding his financial condition, or for debtor's willful and malicious injury to creditor's collateral. The Bankruptcy Court, John L. Peterson, Chief Judge, held that: (1) creditor failed to show that it had reasonably relied on debtor's false financial statements, and (2) debt could not be excepted from discharge, as one for debtor's "willful and malicious injury" to creditor's property in gifting to his girlfriend and ex-stepsons the personal property securing creditor's claim.

Judgment for debtor.

West Headnotes

**[1] Bankruptcy 51 ⟺3372.28**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
       51X(C)4 Fraud
         51k3372.27 False Financial Statements
           51k3372.28 k. In General. Most Cited Cases
   (Formerly 51k3353(12.1))
To obtain judgment excepting debt from discharge as one for debtor's materially false statement in writing regarding his or her financial condition, creditor must show: (1) a representation of fact by debtor, (2) that was material, (3) that debtor knew at the time to be false, (4) that debtor made with intention of deceiving creditor, (5) upon which creditor relied, (6) reasonably, and (7) sustained damage as proximate result. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[2] Bankruptcy 51 ⟺3372.31**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
       51X(C)4 Fraud
         51k3372.27 False Financial Statements
           51k3372.31 k. "Materially False" Statements. Most Cited Cases
   (Formerly 51k3353(12.15))
Financial statement that leaves any discrepancy between overall impression left by statement and the endorser's true financial status gives rise to a "material" falsehood, for debt dischargeability purposes. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[3] Bankruptcy 51 ⟺3372.30**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
       51X(C)4 Fraud
         51k3372.27 False Financial Statements
           51k3372.30 k. Intent; Recklessness. Most Cited Cases
   (Formerly 51k3353(12.10))
Debtor's reckless disregard or gross recklessness as to the truth of statements contained in written financial statement is sufficient to satisfy the "knowledge" element of dischargeability exception, even if debtor does not know of the inaccuracies in statement. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[4] Bankruptcy 51 ⟺3372.38**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278                                                                                                   Page 2
219 B.R. 278
**(Cite as: 219 B.R. 278)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)4 Fraud
            51k3372.37 Reasonableness
               51k3372.38 k. In General. Most
Cited Cases
    (Formerly 51k3353(14.6))
Reasonable, and not merely justifiable, reliance on materially false statements contained in written financial statement is required in order for statements to provide basis for excepting debt from discharge. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[5] Bankruptcy 51 ⬅⬆ 3372.38**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)4 Fraud
            51k3372.37 Reasonableness
               51k3372.38 k. In General. Most
Cited Cases
    (Formerly 51k3353(14.6))
Unlike "justifiable reliance," which focuses on whether the falsity of representation was or should have been readily apparent to individual to whom it was made, "reasonable reliance," such as is required in order to except debt from discharge as one for money obtained by debtor's materially false statement in writing regarding his or an insider's financial condition, focuses on whether creditor's reliance would have been reasonable to the hypothetical average person. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[6] Bankruptcy 51 ⬅⬆ 3374(11)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)5 Torts and Crimes
            51k3374 Willful or Malicious Injury
               51k3374(8) Particular Injuries
                  51k3374(11) k. Disposition of or
Injury to Collateral. Most Cited Cases

(Formerly 51k3355(4))

**Bankruptcy 51 ⬅⬆ 3405(14)**

51 Bankruptcy
   51X Discharge
      51X(D) Determination of Dischargeability
         51k3401 Evidence
            51k3405 Weight and Sufficiency
               51k3405(12) Degree of Proof Required
                  51k3405(14) k. Particular Cases.
Most Cited Cases
    (Formerly 51k3422(11))
"Injury to property," such as may provide basis for excepting debt from discharge as one for debtor's willful and malicious injury to property of another, includes a conversion of property subject to creditor's security interest; however, burden falls on creditor to prove that conversion was both willful and malicious, by a preponderance of evidence. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[7] Bankruptcy 51 ⬅⬆ 3374(2)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)5 Torts and Crimes
            51k3374 Willful or Malicious Injury
               51k3374(2) k. Willful, Deliberate,
or Intentional Injury. Most Cited Cases
    (Formerly 51k3355(1.10))

**Bankruptcy 51 ⬅⬆ 3374(4)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)5 Torts and Crimes
            51k3374 Willful or Malicious Injury
               51k3374(4) k. Knowledge; Knowing Disregard. Most Cited Cases
    (Formerly 51k3355(1.20))
For injury to be "willful and malicious," for debt dischargeability purposes, debtor must have desired

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
**(Cite as: 219 B.R. 278)**

Page 3

to cause injury complained of, or must have be-lieved that the consequences were substantially cer-tain to result from his or her acts. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[8] Bankruptcy 51 ⟜3374(11)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(8) Particular Injuries
                        51k3374(11) k. Disposition of or Injury to Collateral. Most Cited Cases
    (Formerly 51k3355(4))
To obtain judgment excepting debt from discharge as one for money obtained by debtor's "willful and malicious" conversion of creditor's collateral, cred-itor must show that debtor converted collateral either with specific intent of depriving creditor of collateral or with knowledge, to a substantial cer-tainty, that creditor would be harmed by conver-sion. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[9] Bankruptcy 51 ⟜3374(4)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(4) k. Knowledge; Know-ing Disregard. Most Cited Cases
    (Formerly 51k3355(1.20))

**Bankruptcy 51 ⟜3374(11)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(8) Particular Injuries
                        51k3374(11) k. Disposition of or Injury to Collateral. Most Cited Cases

(Formerly 51k3355(4))
Subjective test which applies in assessing the "willful and malicious" nature of debtor's acts, for debt dischargeability purposes, focuses on whether injury was in fact anticipated by debtor, and thus insulates innocent collateral conversions from nondischargeability. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[10] Bankruptcy 51 ⟜3372.42**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)4 Fraud
                51k3372.37 Reasonableness
                    51k3372.42 k. Particular Cases. Most Cited Cases
    (Formerly 51k3353(14.25))
Creditor failed to show that it had reasonably relied on Chapter 7 debtor's false financial statements, in proposing to grant creditor a security interest in personal property previously awarded to his ex-wife, when creditor decided to allow debtor to be substituted as sole party responsible for repaying previous loan to debtor and his ex-wife; creditor was aware of inaccuracies in financial statement and chose to proceed, not in reliance on statement, but on debtor's good credit and past loan history of almost ten years. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**[11] Bankruptcy 51 ⟜3374(11)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(8) Particular Injuries
                        51k3374(11) k. Disposition of or Injury to Collateral. Most Cited Cases
    (Formerly 51k3355(4))
Debtor's obligation to creditor could not be excep-ted from discharge in Chapter 7, as one for debtor's "willful and malicious injury" to creditor's property

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
**(Cite as: 219 B.R. 278)**

Page 4

in gifting to his girlfriend and ex-stepson the personal property securing creditor's claim, given complete lack of evidence that property was transferred with any intent to injure creditor or with knowledge that such injury was substantially certain to result; at time of transfers, debtor was experiencing mental problems and was at most reckless with respect to creditor's property rights. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[12] Bankruptcy 51 ⇐3372.36**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)4 Fraud
                51k3372.36   k.   Reliance;   Time   Element. Most Cited Cases
        (Formerly 51k3353(14))
Lender that knows of obvious inaccuracies in financial statement is not permitted to nonetheless proceed with its lending, only to sue the debtor at later date claiming that debtor's obligation is nondischargeable because his financial statement was materially false. Bankr.Code, 11 U.S.C.A. § 523(a)(2)(B).

**\*280** Lewis K. Smith, Smith Law Firm, Helena, MT, for Plaintiff.
Scott M. Radford, Great Falls, MT, for Defendant.

### *ORDER*

JOHN L. PETERSON, Chief Judge.
    Debtor Robert W. Kidd ("Kidd") filed a voluntary Chapter 7 bankruptcy petition on August 6, 1997. On October 16, 1997, Plaintiff AVCO Financial Services of Billings ("AVCO") filed an adversary complaint against Kidd seeking to except from discharge, pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(6), the sum of $6,808.00. Kidd filed a timely answer to AVCO's complaint on October 20, 1997, denying each and every allegation contained in AVCO's Complaint and requesting judgment in his favor along with reasonable attorney's fees and costs pursuant to 11 U.S.C. §

523(d).[FN1]

> FN1. Kidd, in his answer, included a request for reimbursement of fees pursuant to 11 U.S.C. § 523(d). However, neither party raised the issue at trial. In addition, Kidd did not address the issue in his posttrial memorandum which was filed on January 2, 1998. Thus, the Court deems the matter waived.

    Subsequently, after due notice, trial was held December 18, 1997, at Great Falls where Lewis K. Smith appeared on behalf of AVCO and Scott M. Radford appeared on behalf of Kidd. In addition, the Chapter 7 Trustee appeared, Kidd, Valerie St. Clair ("Valerie")-an AVCO Branch Manager-and Jared DiAddegio ("Jared")-a former loan officer of AVCO-testified and Exhibits 1-4 were introduced into evidence without objection. At the close of trial, the Court granted the parties ten days to file memoranda in support of their respective positions and took the matter under advisement. Each party has now filed their respective memoranda. Thus, the Court deems the record closed and the matter is ready for decision. After considering the testimony presented at trial, and after reviewing the record and applicable law, the Court finds for Kidd.

### I

    In January and April, 1994, Kidd and Jeanne F. Kidd ("Jeanne")-Kidd's former spouse-obtained two loans from AVCO and gave as security for the loans, a 300 Winchester Magnum, 30.06 Savage Rifle, bench weight lifting set, Magnavox television, Sharp VCR and four pieces of art. Thereafter, Jeanne and Kidd separated and pursuant to the parties' Decree of Dissolution entered October 13, 1994, which incorporated a Stipulation dated September 22, 1994, Kidd received the VCR and two of the four pieces of art while Jeanne received "[a]ll furnishings of the family home." [FN2] The parties also agreed that Kidd would be responsible for and would hold Jeanne harmless for the two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
(Cite as: 219 B.R. 278)

Page 5

AVCO loans.

FN2. From the evidence and testimony at trial, it appears that the Magnavox television, two of the four pieces of art and the bench weight lifting set were included among the "furnishings of the family home."

**\*281** In August or September of 1996, almost two years after Kidd and Jeanne separated and after considerable prompting by Jeanne, Kidd finally contacted AVCO seeking to consolidate the two obligations and to remove Jeanne's name from the accounts. During this same time, Jeanne also contacted AVCO wanting to know if her name had been removed from the accounts and to verify that Kidd was making the monthly payments on the joint obligations. In addition, Valerie testified that Jeanne had telephoned AVCO in the fall of 1995 to close the couple's revolving line of credit-one of the two AVCO obligations which Kidd assumed pursuant to the Decree of Dissolution.

Jared was the AVCO employee who received Kidd's telephone call in the fall of 1996 and proceeded to write a new loan for Kidd. Jared ran a credit report on Kidd and also reviewed Kidd and Jeanne's previous loan files. Jared then filled out a new loan application for Kidd individually based upon the information in the previous loan files and on the new credit report. When Kidd arrived at AVCO's office, Kidd provided, in his own handwriting, a list of collateral he was pledging as security, which included all the security listed in Kidd and Jeanne's previous loan documents FN3 along with an RCA 18 satellite dish. Kidd and Jared then reviewed the loan documents together and Kidd signed the Loan Application, the security agreement, including Schedule A, and the FS-1.

FN3. Although Kidd pledged this property as collateral for the new loan, Jeanne had been awarded the bench weight lifting set, the Magnavox television and two of four works of art in the couple's 1994 Decree of Dissolution.

Kidd testified that while he and Jared were reviewing the loan documents, Kidd advised Jared that some of the items of collateral listed in the loan application were no longer in his possession as Jeanne had received some of the items in the divorce. Jared testified that he could not remember such a conversation. Jared is no longer employed by AVCO and appeared pursuant to a subpoena. Thus, the Court finds Jared's testimony credible. However, Kidd's testimony was equally credible and since Jared did not unequivocally contradict Kidd's testimony, the Court finds that AVCO was aware, through Jared, that some of the items of collateral, which were merely transferred from Jeanne and Kidd's loan documents to the 1996 loan documents, were awarded to Jeanne in the divorce.

Kidd signed the loan documents and they were then presented to Valerie for review and approval. Valerie testified that she reviewed the loan documents and based upon Kidd's good credit, Kidd's past loan history and on the large value of collateral, Valerie approved the loan. Thus, Kidd received a check for twenty-five cents, Jeanne's name was removed from the obligations and Kidd now had one loan payment instead of two.

In addition to the foregoing, the Schedule of Insured Personal Property, Exhibit 3, contained the following language:
I/We hereby certify that I am/we are the sole owner(s) of the property listed above, free and clear of any liens, claims, mortgages, attachments or offsets, of any nature whatsoever, of the property described above.
I/We further certify that property listed and described above is located at my/our address set forth on the security agreement.

The FS-1 also contained, on the back page, the following:I will not remove the property from the state, or sell or transfer the property without AVCO's written consent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
**(Cite as: 219 B.R. 278)**

Despite the foregoing language, Kidd testified that the 300 Winchester Magnum, and 30.06 Savage Rifle were in his ex-step sons' possession at the time he signed the 1996 loan application. Kidd also testified that in April or May of 1997, Kidd gave to his then girlfriend, Nicole, the VCR and the two prints which he received in the divorce. Kidd also gave Nicole the RCA satellite dish. Thus, Kidd no longer has any of the collateral which he pledged as security for the consolidated AVCO loan, prompting AVCO to file the instant adversary proceeding.

### *282 II

This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This is a core proceeding for purposes of § 157(b)(1). The burden falls on the creditor to prove the elements of its non-dischargeability claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."). A creditor's burden, in conjunction with the "fresh start" policy of the Bankruptcy Code, creates a sizeable obstacle for creditors to overcome in order to prevail on a non-dischargeability complaint. As the Ninth Circuit Court of appeals stated:

One of the fundamental policies of the Bankruptcy Code is the fresh start afforded debtors through the discharge of their debts. *In re Devers,* 759 F.2d 751, 754-55 (9th Cir.1985). In order to effectuate the fresh start policy, exceptions to discharge should be strictly construed against an objecting creditor and in favor of the debtor. *In re Klapp,* 706 F.2d 998, 999 (9th Cir.1983).

*Snoke v. Riso (In re Riso),* 978 F.2d 1151, 1154 (9th Cir.1992).

### III

#### a. 11 U.S.C. § 523(a)(2)(B).

[1] The Ninth Circuit Court of Appeal in *Siriani v. Northwestern Nat'l Ins. Co. (In re Siriani),* 967 F.2d 302, (9th Cir.1992), set forth the elements of an action based upon § 523(a)(2)(B) [FN4], requiring:

FN4. Section 523(a)(2)(B) reads:
A discharge under section 727, 1141, 1128(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor for any debt-
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by-
(B) use of a statement in writing-
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

(1) a representation of fact by the debtor,
(2) that was material,
(3) that the debtor knew at the time to be false,
(4) that the debtor made with the intention of deceiving the creditor,
(5) upon which the creditor relied,
(6) that the creditor's reliance was reasonable,
(7) that damage proximately resulted from the misrepresentation.

*Siriani,* at 304.

[2] On the issue of materiality, a financial statement that leaves "any discrepancy" between the overall impression left by the statement and the endorser's true financial status gives rise to a material falsehood for the purposes of § 523(a)(2)(B). *North Park Credit v. Harmer (In re Harmer),* 61 B.R. 1, 5 (Bankr.D.Utah 1984) (citing cases); *accord, Texas Am. Bank, Tyler, N.A. v. Barron (In re Barron),* 126 B.R. 255 (Bankr.E.D.Texas 1991) (citing cases). A "long line of cases" has held that in a personal financial statement, the "omission,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
(Cite as: 219 B.R. 278)

concealment, or understatement of any of [a] debt-or's material liabilities constitutes a 'materially false' statement." *Harmer,* 61 B.R. at 5.

[3] Moreover, even if a debtor does not know of inaccuracies contained in a written financial statement, this Court has held that reckless disreg-ard for the truth satisfies the knowledge element of § 523 and its predecessor. *Baker v. Duneman (In re Duneman),* 12 Mont. B.R. 253, 259 (1993). "Gross recklessness to the truth also satisfies the fourth ... element of intention of deceiving." *Id.* (citing *Knoxville Teachers Credit Union v. Parkey,* 790 F.2d 490, 492 (6th Cir.1986)).

[4][5] While the United States Supreme Court in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), adopted justifiable reliance as the appropriate standard under § 523(a)(2)(A), Con-gress has expressly stated that a creditor's reliance under § 523(a)(2)(B) must be reasonable. The reas-onable reliance standard differs from the **\*283** justi-fiable standard in that the inquiry regarding the jus-tifiable standard:

> [W]ill thus focus on whether the falsity of the representation was or should have been readily ap-parent to the individual to whom it was made. This is a less exacting standard than "reasonable" reli-ance, which would focus on whether reliance would have been reasonable to the hypothetical average person.

4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, § 523.08[1][d] (15th ed.1997).

In *Field,* the Supreme Court reasoned that the more exacting "reasonable" reliance standard in § 523(a)(2)(B) was "tied to the peculiar potential of financial statements to be misused not just by debt-ors, but by creditors who know their bankruptcy law." The Supreme Court completed its reasoning:

> The House Report on the Act suggests that Congress wanted to moderate the burden on indi-viduals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative

equities might be affected by practices of consumer finance companies, which sometimes have encour-aged such falsity by their borrowers for the very purpose of insulating their own claims from dis-charge.

*Field,* 516 U.S. at 76-77, 116 S.Ct. at 447.

### b. 11 U.S.C. § 523(a)(6).

[6] Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Ninth Circuit Court of appeals has held that injury to property un-der § 523(a)(6) "includes the conversion of property subject to a creditor's security interest." *Riso,* 978 F.2d at 1154. However, as previously noted, the burden falls on the creditor to prove that a conver-sion was both willful and malicious by a preponder-ance of the evidence. *Grogan,* 498 U.S. at 291, 111 S.Ct. at 661.

Prior to a recent United States Supreme Court decision, there was a split among the Circuits con-cerning what constituted "willful and malicious" conduct under § 523(a)(6). Many courts, including the Ninth Circuit Court of Appeals found that the § 523(a)(6) "willful and malicious injury" exception to discharge referred to "an intentional act which causes injury." *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1442 (9th Cir.1986).

In *Cecchini,* the Ninth Circuit rejected the holdings of both the trial court and the Bankruptcy Appellate Panel ("BAP"), both of which followed the stricter line of authority requiring "that intent to injure a creditor [as opposed to an intentional act which results in injury] is a necessary element of § 523(a)(6)." *Id.* In adopting a "looser" or "less strict" standard, the Ninth Circuit held that "[w]hen a wrongful act such as conversion, done intention-ally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
(Cite as: 219 B.R. 278)

absent proof of a specific intent to injure." *Id.* at 1443.

In *Tiger v. Speerstra (In re Speerstra),* 12 Mont.B.R. 281 (Bankr.Mont.1993), this Court recognized that willful and malicious conduct is conduct that is intentional and deliberate and over which the debtor exercises meaningful control, "as opposed to unintentional or accidental conduct." *Id.* at 287 (quoting *Borg-Warner Acceptance Corp. v. Littleton (In re Littleton),* 106 B.R. 632, 637 (9th Cir. BAP 1989)). *See also Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) ("a wilful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice."). Nevertheless, relying on the Ninth Circuit Court of Appeal's holding in *Cecchini,* this Court, in *AVCO Financial Services v. Lucas (In re Lucas),* 15 Mont.B.R. 447 (Bankr.Mont.1996) determined that the willful and malicious injury exception to discharge under § 523(a)(6) encompassed deliberate or intentional acts that lead to injury, such as the intentional disposition of collateral.

The Supreme Court, however, recently resolved the inter-Circuit conflict and in doing **\*284** so, has overruled *Cecchini* and its progeny.[FN5] *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), *aff'g Geiger v. Kawaauhau (In re Geiger),* 113 F.3d 848 (8th Cir.1997). In *Kawaauhau,* the petitioners sought to have their medical malpractice award against the debtor/doctor declared non-dischargeable under § 523(a)(6). In that case, the Supreme Court held that the § 523(a)(6) "willful and malicious injury" exception to discharge is limited to intentional torts and does not encompass mere negligent or reckless acts. *Kawaauhau,* 523 U.S. at ---- - ----, 118 S.Ct. at 976-77 ("[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not

merely a deliberate or intentional act that leads to injury."). Thus, the petitioners' medical malpractice claim was dischargeable under § 523(a)(6) despite the fact that the debtor/doctor intentionally rendered inadequate medical care.

> FN5. This Court's holding in *Lucas* was based in large part on *Cecchini;* thus, to the extent the holding in *Lucas* suggests that a less strict or looser standard is intended, it is overruled.

The decision in *Kawaauhau* dealt with medical malpractice. It did not, however, address the applicability of § 523(a)(6) in the context of secured transactions. Therefore, this Court must now determine the parameters of § 523(a)(6) in the context a collateral conversion claim. The problem with conversion cases such as *Lucas* and the instant case is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result form a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is the result of a negligent or reckless tort-but not willful and malicious.

The Third Circuit Court of Appeals, in *Conte v. Gautam (In re Conte),* 33 F.3d 303 (3rd Cir.1994) addressed the fine differentiation between reckless or negligent torts and intentional torts:

All reckless acts involve an intentional act that is wrong (because it is reckless) and that is significantly likely to lead to injury. For an act to be reckless "it is enough that [the actor] realizes or, from facts which he knows, *should realize* that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless." *Restatement (Second) of Torts* § 500, Cmt. f (1965). *See also* Prosser & Keeton, *supra* § 8 at 36. Thus, when Congress required more than recklessness for nondischargeability, it required that the debtor have engaged in conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

more culpable than taking a deliberate action that had a high probability of producing harm. This result is also supported by the statutory language under which "willful" modifies injury; for an injury to be willful it surely must be more than a highly likely but unintended result of the debtor's action. Rather, for the injury to have been "willed" by the debtor, it must at least have been substantially certain to result from the debtor's act.

* * * * * *

The Congressional Committee reports which stated that to be "willful and malicious" an action must be more than reckless also stated that " 'willful' means deliberate or intentional.' " *See supra* at 5. Although it would be plausible to argue that an injury is intentional only if the actor desired to cause the injury, under the common law "[t]he word 'intent ... denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.' "*Restatement (Second) of Torts* § 8A (1979) (emphasis added).

Intent is not ... limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses *285 the character of intent and becomes mere recklessness ...

*Id.* at § 8A, Cmt. b.

*Id.* at 307-08. In addition, the Eighth Circuit Court of Appeals in *Geiger* provides similar guidance which is quite compelling, especially in light of the Supreme Court's affirmance of said decision in *Kawaauhau:*[T]he word "intentional," by itself, will, almost as a matter of natural reflex, cause a lawyer's mind to turn to that category of wrongs known as intentional torts, a category that excludes injuries caused by acts that are merely negligent, grossly negligent, or even reckless.

* * * * * *

We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of an act rather than the act itself." *Restatement (Second) of Torts* § 8A, comment a, at 15 (1965). Unless the actor "desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort. *Id.* § 8A at 15.

*Geiger,* 113 F.3d at 852.

[7][8][9] The Court finds such reasoning persuasive. Thus, following the aforementioned reasoning and pursuant to the Supreme Court's holding in *Kawaauhau,* a creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believed that the consequences were substantially certain to result from the debtors acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

## IV

[10] Applying the foregoing to the evidence at bar, the Court finds that AVCO has not met its burden of proof under either 11 U.S.C. § 523(a)(2)(B) or § 523(a)(6). First, the Court finds that AVCO's reliance under § 523(a)(2)(B) was not reasonable. Kidd testified that he told Jared that several of the items had been awarded to Jeanne pursuant to a Decree of Dissolution. An ordinary person presented with this information would have recognized at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

once the obvious falsity of Kidd's financial statements. This case merely exemplifies the principal recognized by courts, including the Supreme Court:

> While the legislative history to section 523(a)(2)(B) mentions that a "creditor often has sources of information, such as credit bureau reports, to verify the accuracy of a debtor's list of debts on a financial statement," a careful reading discloses that this statement is a recognition of creditors' unprincipled practice of using forms or providing instructions that produce an incomplete financial picture of the debtor and then later suing the debtor claiming intentional fraud based on the debtor's signing a declaration regarding the completeness of the statement. *See* H.R .Rep. No. 95-595, at 130-31, U.S.Code Cong. & Admin.News 1978, at 6091-6092.

*Groth v. Masegian (In re Masegian),* 134 B.R. 402, 407 (Bankr.E.D.Cal.1991); *Field,* 516 U.S. at 76-77, 116 S.Ct. at 446-47.

In addition, the Court finds that it was Kidd's good credit and past loan history of almost ten years that convinced AVCO to remove Jeanne's name from the two AVCO obligations. In fact, the entire loan re-write by AVCO was to remove Jeanne's name from the loans, not to loan Kidd additional funds. Furthermore, the value of the collateral, less the items belonging to Jeanne, were still $8,598.99, which exceeded $5,408.89-the amount re-financed.[FN6] For the foregoing reasons, **286** the Court finds that AVCO has failed to prove, by a preponderance of the evidence, that it reasonably relied on Kidd's Schedule of Insured Personal Property. Thus, AVCO's claim under § 523(a)(2)(B) must fail.

> FN6. Jeanne was awarded collateral with a value of $8,400.00. However, at the time Kidd entered into the new agreement with AVCO, he owned, but was not in possession of the 200 Winchester magnum and the 30.06 Savage Rifle. Thus, the total value of collateral that was in Kidd's possession in the fall of 1996 was $7,998.99.

[11] AVCO's claim under § 523(a)(6) must fail as well since AVCO failed to establish that Kidd gave the remaining collateral, consisting of the satellite dish, the guns, the works of art and the VCR to Nicole and his ex-step sons with the intent to injure AVCO. In the case at bar, there is no suggestion whatsoever that Kidd intended, or even desired, to cause injury to AVCO. Moreover, the Court finds no evidence indicating that Kidd believed that AVCO was substantially certain to suffer harm as a result of his actions. Rather, the evidence at trial revealed that Kidd was experiencing mental problems and was on depression medication when he either gave the items to Nicole or Nicole took them.[FN7] Thus, while Kidd's actions may have been negligent or reckless, they do not rise to the level of willful and malicious.

> FN7. From the testimony at trial, it was unclear whether Kidd actually gave the items to Nicole, whether Nicole took the items, or whether Kidd merely left the items with Nicole when Kidd and Nicole's relationship deteriorated. With regard to the guns, Kidd testified that his ex-step sons had them, and that he never requested that they be returned. The Court assumes that the same is true with the items in Nicole's possession-that Kidd left them with her, and never requested that she turn them over.

V

[12] After carefully considering the facts of the instant case, the Court finds that AVCO has not sustained its burden of proof. First, a lender that knows of obvious inaccuracies in a financial statement is not permitted to nonetheless proceed with its lending, only to sue the debtor at a later date claiming that a debtor's obligation is non dischargeable because the financial statements are materially false-lenders must accept some responsibility for their sometimes unprincipled practices. In addition, AVCO failed to prove that Kidd's unauthorized disposition of collateral was done deliber-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

219 B.R. 278
219 B.R. 278
**(Cite as: 219 B.R. 278)**

ately or intentionally to injure AVCO. Thus, AVCO's Complaint must fail. Finally, since the matter of fees, pursuant to 11 U.S.C. § 523(d) is deemed waived, each party shall bear their own costs of suit.

IT IS THEREFORE ORDERED a separate Judgment shall be entered in favor of Defendant, Robert W. Kidd and against Plaintiff, AVCO Financial Services of Billings; and the Complaint to determine the dischargeability of debt filed by AVCO Financial Services of Billings on October 16, 1997, is dismissed with prejudice.

Bkrtcy.D.Mont.,1998.
In re Kidd
219 B.R. 278

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

190 F.3d 455                                                                    Page 1
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

▷
In re Markowitz
C.A.6 (Mich.),1999.
1999 FED.APP. 0343P
United States Court of Appeals,Sixth Circuit.
In re Seymour MARKOWITZ, Debtor.
Seymour Markowitz, Appellant,
v.
Carolyn Campbell, Appellee.
**No. 97-2075.**

Argued: Oct. 29, 1998.
Decided and Filed: Sept. 23, 1999.

Judgment creditor brought adversary proceeding
against Chapter 7 debtor-attorney, alleging that
judgment debt arising out of legal malpractice ac-
tion against debtor was nondischargeable as debt
for willful and malicious injury. Parties cross-
moved for summary judgment. The Bankruptcy
Court ruled in judgment creditor's favor. Debtor ap-
pealed. The United States District Court for the
Eastern District of Michigan, Anna Diggs Taylor,
J., affirmed. Debtor appealed. The Court of Ap-
peals, Suhrheinrich, Circuit Judge, held that: (1) is-
sue of willful and malicious injury was not actually
litigated in legal malpractice action; (2) judgment
creditor's unsuccessful request for special interrog-
atory asking whether debtor's actions were inten-
tional or willful did not have collateral estoppel ef-
fect; (3) unless actor desires to cause consequences
of his act, or believes that consequences are sub-
stantially certain to result from it, he has not com-
mitted "willful and malicious injury,"
overruling*Perkins v. Scharffe*, 817 F.2d 392; and
(4) remand for determination of whether judgment
debt fell within discharge exception for willful and
malicious injury was required.

Affirmed in part, vacated in part, and remanded.

Boggs, Circuit Judge, dissented and filed a separate
opinion.

West Headnotes

**[1] Bankruptcy 51 €══3774.1**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3774 Notice of Appeal; Time
            51k3774.1 k. In General. Most Cited
Cases
Although Chapter 7 debtor's notice of appeal was
not effective until entry of order denying his motion
to reconsider filed on same date as notice of appeal,
notice was not nullified and refiling was not re-
quired under bankruptcy rules. Fed.Rules
Bankr.Proc.Rules 8002(b), 9023, 11 U.S.C.A.

**[2] Bankruptcy 51 €══3776.1**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3776 Effect of Transfer
            51k3776.1 k. In General. Most Cited
Cases
District court lacked jurisdiction over Chapter 7
debtor's appeal of nondischargeability ruling from
date that debtor filed both notice of appeal and mo-
tion for reconsideration until date on which recon-
sideration    motion    was    denied.    Fed.Rules
Bankr.Proc.Rules 8002(b), 9023, 11 U.S.C.A.

**[3] Bankruptcy 51 €══3774.1**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3774 Notice of Appeal; Time
            51k3774.1 k. In General. Most Cited
Cases
Notice of appeal from bankruptcy court's nondis-
chargeability ruling that was filed after entry of or-
der, but before entry of final judgment, was valid,
even if order lacked requisite characteristics of fi-
nality, pursuant to rule treating notices of appeal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455                                                                          Page 2
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

filed after announcement of decision but before
entry of judgment as having been filed after entry
of judgment. Fed.Rules Bankr.Proc.Rule 8002(a),
11 U.S.C.A.

**[4] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Court of Appeals reviews de novo the applicability
of collateral estoppel.

**[5] Judgment 228 ☞634**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in Gener- al
            228k634 k. Nature and Requisites of
Former Adjudication as Ground of Estoppel in
General. Most Cited Cases
The doctrine of "collateral estoppel" precludes rel-
itigation of issues of fact or law actually litigated
and decided in a prior action between the same
parties and necessary to the judgment, even if de-
cided as part of a different claim or cause of action.

**[6] Judgment 228 ☞828.3**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts
in United States Courts
            228k828.3 k. Operation and Effect in
General. Most Cited Cases

**Judgment 228 ☞828.16(1)**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts
in United States Courts
            228k828.16 Issues or Questions Presented
                228k828.16(1) k. In General. Most

Cited Cases
Collateral estoppel will apply where (1) the law of
collateral estoppel in the state in which the issue
was litigated would preclude relitigation of such is-
sue, and (2) the issue was fully and fairly litigated
in state court. 28 U.S.C.A. § 1738.

**[7] Judgment 228 ☞634**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in Gener- al
            228k634 k. Nature and Requisites of
Former Adjudication as Ground of Estoppel in
General. Most Cited Cases
Under Michigan law, "collateral estoppel" pre-
cludes the relitigation of an issue in a subsequent,
different cause of action between the same parties
where the prior proceeding culminated in a valid,
final judgment and the issue was actually litigated
and necessarily determined.

**[8] Judgment 228 ☞720**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k. Matters Actually Litigated
and Determined. Most Cited Cases
An issue is actually litigated, for purposes of collat-
eral estoppel under Michigan law, if it is put into is-
sue by the pleadings, submitted to the trier of fact,
and determined by the trier of fact.

**[9] Judgment 228 ☞724**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k723 Essentials of Adjudication
                228k724 k. In General. Most Cited Cases
Under Michigan law, an issue is necessarily de-
termined, for purposes of collateral estoppel, if it is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455                                                                                         Page 3
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

essential to the judgment.

**[10] Judgment 228 ⟷828.21(2)**

228 Judgment
   228XVII Foreign Judgments
      228k828 Effect of Judgments of State Courts
in United States Courts
         228k828.21 Particular Federal Proceed-
ings
           228k828.21(2) k. Bankruptcy. Most
Cited Cases
Issue of willful and malicious injury was not actu-
ally litigated in legal malpractice action in which
jury found malpractice, and therefore finding did
not have collateral estoppel effect in subsequent
proceeding to have resulting judgment debt deemed
nondischargeable under Bankruptcy Code's willful
and malicious discharge exception, in that legal
malpractice judgment under Michigan law required
only finding of negligent conduct. Bankr.Code, 11
U.S.C.A. § 523(a)(6).

**[11] Judgment 228 ⟷828.21(2)**

228 Judgment
   228XVII Foreign Judgments
      228k828 Effect of Judgments of State Courts
in United States Courts
         228k828.21 Particular Federal Proceed-
ings
           228k828.21(2) k. Bankruptcy. Most
Cited Cases
Client's unsuccessful request, in state-court legal
malpractice action, for special interrogatory asking
jury whether attorney's challenged decisionmaking
was intentional or willful did not actually decide is-
sue of whether injury was willful and malicious, so
as to have collateral estoppel effect, under
Michigan law, with respect to client's subsequent
claim that malpractice judgment debt was nondis-
chargeable; state court's refusal to give instruction
was not equivalent of summary judgment in debt-
or's favor or ruling on the merits, and response to
proposed question would not resolve dischargeabil-
ity issue, which required finding of intent to do

harm. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[12] Bankruptcy 51 ⟷3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 ⟷3786**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
           51k3786 k. Clear Error. Most Cited
Cases
Court of Appeals reviews a district court's order
granting summary judgment de novo, and its find-
ings of fact for clear error.

**[13] Bankruptcy 51 ⟷3779**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3779 k. Scope of Review in General.
Most Cited Cases

**Bankruptcy 51 ⟷3783**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3783 k. Presumptions and Burdens of
Proof. Most Cited Cases
Rules of review applicable when party moves for
summary judgment also apply when parties have
filed cross-motions for summary judgment; the
court must evaluate each motion on its own merit
and draw inferences against the party whose motion
is being considered. Fed.Rules Civ.Proc.Rule 56(c),
28 U.S.C.A.

**[14] Bankruptcy 51 ⟷3779**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455

Page 4

190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P

**(Cite as: 190 F.3d 455)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3779 k. Scope of Review in General.
Most Cited Cases
When reviewing a summary judgment decision, an
appellate court must confine its review to the evid-
ence as submitted to the district court.

**[15] Bankruptcy 51 ☞3374(1)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(1) k. In General. Most
Cited Cases
    (Formerly 51k3355(1))
To fall within discharge exception for willful and
malicious injury, debt must be for an injury that is
both willful and malicious; the absence of one cre-
ates a dischargeable debt. Bankr.Code, 11 U.S.C.A.
§ 523(a)(6).

**[16] Bankruptcy 51 ☞3374(2)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(2) k. Willful, Deliberate,
or Intentional Injury. Most Cited Cases
    (Formerly 51k3355(1.10))

**Bankruptcy 51 ☞3374(4)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(4) k. Knowledge; Know-
ing Disregard. Most Cited Cases
    (Formerly 51k3355(1.20))

Unless the actor desires to cause consequences of
his act, or believes that the consequences are sub-
stantially certain to result from it, he has not com-
mitted a "willful and malicious injury" as defined
under Bankruptcy Code's willful and malicious in-
jury discharge exception; overruling *Perkins v.
Scharffe*, 817 F.2d 392. Bankr.Code, 11 U.S.C.A. §
523(a)(6); Restatement (Second) of Torts § 8A.

**[17] Bankruptcy 51 ☞3790**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3789 Determination and Disposition;
Additional Findings
                51k3790 k. Remand. Most Cited Cases
Remand for determination of whether judgment
debt arising from legal malpractice action fell with-
in discharge exception for willful and malicious in-
jury was required when parties and bankruptcy
court, and district court on appeal, relied on then-
prevailing standard, but intervening Supreme Court
decision in *Kawaauhau v. Geiger* set new con-
trolling standard. Bankr.Code, 11 U.S.C.A. §
523(a)(6).

**[18] Bankruptcy 51 ☞3374(7)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3374 Willful or Malicious Injury
                    51k3374(7) k. Just Cause or Ex-
cuse. Most Cited Cases
    (Formerly 51k3355(1.35))
The lack of an excuse or justification for debtor's
actions will not alone make debt nondischargeable
under willful and malicious discharge exception.
Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[19] Bankruptcy 51 ☞3374(9)**

51 Bankruptcy
    51X Discharge

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

Page 5

51X(C) Debts and Liabilities Discharged
   51X(C)5 Torts and Crimes
     51k3374 Willful or Malicious Injury
      51k3374(8) Particular Injuries
       51k3374(9)   k.   In   General;
Fraud. Most Cited Cases
   (Formerly 51k3355(2.1))
Mere fact that Chapter 7 debtor-attorney should
have known that his decisions and actions put client
at risk was insufficient to establish a willful and
malicious injury for nondischargeability purposes.
Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[20] Bankruptcy 51 ⟻3374(2)**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
      51X(C)5 Torts and Crimes
       51k3374 Willful or Malicious Injury
        51k3374(2) k. Willful, Deliberate,
or Intentional Injury. Most Cited Cases
   (Formerly 51k3355(1.10))

**Bankruptcy 51 ⟻3374(4)**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
      51X(C)5 Torts and Crimes
       51k3374 Willful or Malicious Injury
        51k3374(4) k. Knowledge; Know-
ing Disregard. Most Cited Cases
   (Formerly 51k3355(1.20))
For debtor's conduct to bring debt within discharge
exception for willful and malicious injury, debtor
must will or desire harm, or believe injury is sub-
stantially certain to occur as a result of his behavi-
or. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

***457** John C. Lange (argued and briefed), Gold,
Lange & Majoros, P.C., Southfield, Michigan, for
Appellant.
Lawrence J. Acker (argued), Bloomfield Hills,
Michigan, Clay E. Ottoni (briefed), Clay E. Ottoni,
P.C., Farmington Hills, Michigan, for Appellee.

***458** Before: BOGGS, SUHRHEINRICH, and
SILER, Circuit Judges.

SUHRHEINRICH, J., delivered the opinion of the
court, in which SILER, J., joined. BOGGS, J. (pp.
466-68), delivered a separate dissenting opinion.

SUHRHEINRICH, Circuit Judge.
   Section 523(a)(6) of the Bankruptcy Code
provides that a debt "for willful and malicious in-
jury by the debtor to another" is non-dischargeable.
11 U.S.C. § 523(a)(6). The principal question be-
fore us is whether a debt arising from the legal mal-
practice judgment against Appellant, Seymour
Markowitz, falls within this statutory exception.
Finding jurisdiction proper in the district court and
in this appeal, we **AFFIRM** the judgment below on
the issue of collateral estoppel. However, we **VA-
CATE** the judgment of the district court on the is-
sue of dischargeability and **REMAND** the case for
further proceedings consistent with this opinion and
the recent decision of the Supreme Court in
*Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974,
140 L.Ed.2d 90 (1998).

**I.**

   Seymour Markowitz is a licensed attorney
practicing in Michigan. On May 17, 1991, Markow-
itz filed a divorce action in Wayne County Circuit
Court on Carolyn Campbell's behalf. On May 20,
1991, Campbell's husband filed an annulment ac-
tion in the Oakland County Circuit Court. Also on
May 20, Carolyn Campbell personally delivered pa-
pers served upon her for the Oakland County action
to Markowitz. Markowitz did not file a response to
the Oakland County action and a default judgment
was entered against Carolyn Campbell on August
23, 1991. On September 20, 1991, Markowitz pre-
vailed on a motion to dismiss the Oakland County
action. Afterward, Campbell's husband gave
Markowitz a proposed order dismissing the action
along with notice that the dismissal order would be
entered within seven days. Markowitz did not file

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

objections and neither approved nor contested it. As a result, the dismissal of the action failed to vacate the default judgment and the dismissal order did not correct the record, i.e., it was not entered *nunc pro tunc*, and the default judgment remained despite the dismissal. Carolyn Campbell continued to be garnished and her husband began attempting to collect on the default judgment. (J.A. at 99-100). Markowitz testified that he believed the dismissal order effectively vacated the default judgment and that no specific language other than that granting the dismissal of the cause was required in the order. (J.A. at 98-101). Therefore, he felt that no further action was necessary and that the default judgment could not be enforced, despite the fact that the dismissal order did not expressly vacate the default judgment or enter the dismissal *nunc pro tunc*. (J.A. at 98-101). Thereafter, Markowitz withdrew as Campbell's counsel on November 27, 1991, at which time the dismissal of the Oakland County action remained in effect.

Upon appeal by Campbell's husband, the Michigan Court of Appeals reversed the Oakland County dismissal-reinstating the case in Oakland County and reinstating the default judgment of annulment. Markowitz was no longer Carolyn Campbell's attorney. Subsequent efforts by Carolyn Campbell to have the default judgment set aside were denied by the Oakland County Circuit Court. And, ultimately, the Wayne County Circuit Court dismissed the action pending in that court because jurisdiction had been obtained in the matter by the Oakland County Circuit Court.

Although Campbell had often requested that Markowitz take action and file responses and pleadings in the two courts, Markowitz failed to do so. Markowitz admitted that he knew Campbell could suffer a default from his actions. (J.A. at 93-94). He admitted that he filed no papers on her behalf in Oakland County prior to the default, and he admitted that this was a conscious decision. (J.A. at 96). Markowitz*459 believed that the Wayne County action was pending and had precedence, (J.A. at

95), and that the dismissal of the Oakland County judgment effectively vacated the default. When Carolyn Campbell was issued a show cause order for failure to pay child support, Markowitz informed someone from the friend of the court, while in Oakland County Circuit Court on another matter, that there was a prior action in Wayne County and that the show cause order should therefore not proceed. While he was apparently instructed to bring in some proof of the same, he failed to do so. (J.A. at 77, 112). Markowitz's testimony also indicates that some of his actions or inactions were motivated by legal strategy. He claimed he never spoke with Mr. Campbell because it was his policy never to speak to defendants, despite the fact that Mr. Campbell was representing himself. (J.A. at 77, 111). He also believed that antagonizing Mr. Campbell would be antithetical to Carolyn Campbell's bargaining in pursuit of the law practice as an asset in the divorce. (J.A. at 77, 114). Finally, Markowitz testified that his actions were motivated by the best interests of his client. (J.A. at 77, 95, 96, 118).

On June 11, 1993, Campbell filed a civil action against Markowitz in the Wayne County Michigan Circuit Court alleging legal malpractice. On May 23, 1995, a jury found Markowitz liable for legal malpractice-finding Markowitz was negligent and that his negligence was the proximate cause of Carolyn Campbell's injuries or damages. The jury awarded Campbell $300,000 in damages as a result of the entry of the default judgment.[FN1] On June 12, 1995, Markowitz filed for relief under Chapter 7 of the Bankruptcy Code. On October 10, 1995, Campbell commenced an adversarial proceeding against Markowitz alleging in Count I that her claim to the $300,000 judgment should be declared non-dischargeable under 11 U.S.C. § 523(a)(6) because it was a judgment resulting from willful and malicious injury.

> FN1. Pursuant to the terms of the default judgment, Carolyn Campbell did not get custody of her daughter, she was required to pay child support, she was ordered to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pay the costs of her daughter's college education, she was ordered to pay $115,000 to Mr. Campbell, and Mr. Campbell was awarded the marital home and his law practice. (J.A. at 77, 84, 97). Shortly thereafter, Carolyn Campbell's wages were garnished, her bank account was levied upon, and her automobiles taken to partially satisfy the judgment. (J.A. at 256, 262-63, 77, 102-104, 109).

Markowitz and Campbell filed cross-motions for summary judgment in the Bankruptcy Court as to Count I. On June 12, 1997, the Bankruptcy Court ruled in favor of Campbell, holding that the debt was non-dischargeable. (J.A. at 285-300). Judgment was entered on July 3, 1997. (J.A. at 26-27). The court relied on the record from the malpractice case and stipulations by the parties as to specific facts, including the stipulation that there were no genuine issues as to any material fact. (J.A. at 282) The district court affirmed the bankruptcy court's order-granting Campbell's motion for partial summary judgment and denying Markowitz's cross-motion for summary judgment. (J.A. at 29). Markowitz then appealed to this court. (J.A. at 54).

Markowitz presents three issues on appeal. First, he argues that the malpractice suit decided the issue of willful and malicious injury and that litigation on that issue in the bankruptcy court was barred by collateral estoppel. Second, he contends that his conduct did not cause "willful and malicious injury." Finally, he argues that even if the debt was non-dischargeable, the damages attributable to the willful and malicious injury were unsupported by the record or excessive under the circumstances.

## II.

Initially, we must consider Campbell's challenge to our jurisdiction. *See* *460Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, ----, 118 S.Ct. 1003, 1012-13, 140 L.Ed.2d 210 (1998).

Campbell contends that we lack jurisdiction because the notice of appeal from the bankruptcy court to the district court was invalid.

On June 12, 1997, the bankruptcy court entered an order granting Campbell's motion for summary judgment and denying Markowitz's motion for summary judgment. Markowitz filed a notice of appeal to the district court on June 23, 1997. The same day he also filed a motion for rehearing (the "F.R.B.P. 9023 motion") in the bankruptcy court. On July 3, 1997, the bankruptcy court entered final judgment, without ruling on the motion for reconsideration. On July 15, 1997, the parties filed a stipulation of appellate rights with the district court. This stipulation was entered on August 11, 1997. On August 8, 1997, the bankruptcy court denied the motion for reconsideration.

[1][2] The first issue is whether Federal Rule of Bankruptcy Procedure 9023-governing motions to amend or appeal a judgment, reconsideration, and rehearing-divested the district court of jurisdiction pursuant to F.R.B.P. 8002(b). Bankruptcy Rule 8002(b) states, in part:

A notice of appeal filed after announcement or entry of the judgment, order, or decree but before disposition of any of the above motions is ineffective to appeal from the judgment, order, or decree, or part thereof, specified in the notice of appeal, until the entry of the order disposing of the last such motion outstanding.

F.R.B.P. 8002(b). According to F.R.B.P. 8002(b), the notice of appeal - filed after the order but before disposition of the F.R.B.P. 9023 motion - was ineffective to perfect an appeal from the judgment *until* the entry of the order of the motion for reconsideration. As a result, the notice of appeal was not effective until entry of the August 8 order denying the motion to reconsider. Contrary to Campbell's contention, F.R.B.P. 8002 does not nullify the original notice and require refiling.[FN2] F.R.B.P. 8002 requires a new notice of appeal to be filed only if the motion to reconsider is itself appealed or if the disposition of that motion alters or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455                                                                                                    Page 8
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

amends the previous judgment. Thus, the notice of appeal was suspended until the bankruptcy court decided the F.R.B.P. 9023 motion but ripened upon disposition of that motion.[FN3] No new notice was required. The district court did not have jurisdiction over the appeal between June 23 and August 8. During that period, the district court set dates for oral arguments, a hearing, and briefing, and it took entry of several litigation materials. However, by the time the district court disposed of any issues in the case, it was vested with jurisdiction.

> FN2. Appellee relies on *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982), a case interpreting the language of Fed.R.App.P. 4(a)(4) prior to the 1991 amendment. The language at that time held that a premature notice of appeal was nullified upon the filing of a F.R.B.P. 9023 motion. Now, however:

This rule as amended provides that a notice of appeal filed before the disposition of a specified postjudgment motion will become effective upon disposition of the motion. A notice filed before the filing of one of the specified motions or after the filing of a motion but before disposition of the motion is, in effect, suspended until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the district court or bankruptcy appellate panel.

F.R.B.P. 8002, Committee Note to 1994 Amendments.

> FN3. For cases so holding based on identical language in Fed.R.App.P. 4(a)(4) and Fed.R.Civ.P. 59, *see United States v. Duke*, 50 F.3d 571, 575 (8th Cir.1995); *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1273-74 (4th Cir.1994); *Narey v. Dean*, 32 F.3d 1521, 1523-24 (11th Cir.1994); *Leader Nat'l Ins. Co. v. Industrial Indem. Ins. Co.*, 19 F.3d 444, 445 (9th Cir.1994).

[3] The second issue is whether the notice of appeal filed after the order but before final judg-

ment is invalid because the June 12 order was not a final judgment. Even assuming the June 12 order lacked the requisite characteristics of finality,**461** F.R.B.P. 8002(a) provides that "A notice of appeal filed after the announcement of a decision or order but before entry of the judgment, order, or decree shall be treated as filed after such entry and on the day thereof." Thus, the non-final nature of the June 12 order did not nullify the notice of appeal. Bankruptcy Rule 8002(a) would have made the notice effective upon entry of the judgment on July 3. However, the F.R.B.P. 9023 motion had not been considered at that time; and the notice could not become effective because the judgment was not final. As explained earlier, F.R.B.P. 8002(a) mandates that the notice is suspended until disposition of the F.R.B.P. 9023 motion. Thus, the notice remained suspended, ripening and becoming effective on August 8 when the court denied the F.R.B.P. 9023 motion. No new notice was required because the ruling on the F.R.B.P. 9023 motion was not appealed and the August 8 disposition of that motion did not alter or amend the previous judgment.

For the forgoing reasons, the district court had jurisdiction when judgment was rendered on September 10, 1997. Consequently, we have jurisdiction to reach the merits of Markowitz's appeal.

### III.

During the state court trial, Campbell requested a special interrogatory to the jury "regarding whether or not Mr. Markowitz's *decision making* was intentional or willful." (J.A. at 125 (emphasis added)). The state court refused to give this instruction. On appeal, Markowitz argues that the trial court's refusal was tantamount to a finding that Markowitz's conduct was not willful. He further argues that this "finding" collaterally estops any claim in bankruptcy court that his actions were willful. As such, he contends that issue preclusion required the district court to dismiss the case. We disagree.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455                                                                                                                                 Page 9
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

[4][5] We review de novo the applicability of collateral estoppel. *See, e.g., United States v. Sandoz Pharmaceuticals Corp.*, 894 F.2d 825, 826 (6th Cir.1990). The doctrine of collateral estoppel "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 480 (6th Cir.1992); *accord* *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 n. 23, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("[T]he whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed."); *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

[6] Collateral estoppel will apply where (1) the law of collateral estoppel in the state in which the issue was litigated would preclude relitigation of such issue, and (2) the issue was fully and fairly litigated in state court.[FN4] 28 U.S.C.A § 1738 (West 1994); *see also* *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (noting that § 1738 "directs a federal court to refer to the preclusion law of the State in which the judgment was rendered"); *Haring v. Prosise*, 462 U.S. 306, 312-14, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983).

> FN4. For an application of Michigan rules of issue preclusion (collateral estoppel) and claim preclusion (res judicata) by the Sixth Circuit, *see* *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 820-21 (6th Cir.1996); *Warda v. Commissioner*, 15 F.3d 533, 537 (6th Cir.1994); *Smith, Hinchman and Grylls, Assocs. v. Tassic*, 990 F.2d 256, 257-58 (6th Cir.1993); *Kaufman v. BDO Seidman*, 984 F.2d 182, 184 (6th Cir.1993); *Katt v. Dykhouse*, 983 F.2d 690, 693-94 (6th Cir.1992); *Fellowship of Christ Church v. Thorburn*, 758 F.2d 1140,

1144-45 (6th Cir.1985) (per curiam).

[7][8][9] Under Michigan law, collateral estoppel precludes the relitigation of an issue in a subsequent, different cause of **\*462** action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was actually litigated and necessarily determined. *See People v. Gates*, 434 Mich. 146, 452 N.W.2d 627, 630 (Mich.1990); *see also* *United States v. Three Tracts of Property Located on Beaver Creek*, 994 F.2d 287, 290 (6th Cir.1993). An issue is actually litigated if it is put into issue by the pleadings, submitted to the trier of fact, and determined by the trier of fact. *See* *Latimer v. Mueller & Son, Inc.*, 149 Mich.App. 620, 386 N.W.2d 618, 627 (Mich.Ct.App.1986). An issue is necessarily determined if it is essential to the judgment. *Gates*, 452 N.W.2d at 631.

[10] The jury verdict itself did not actually decide the issue of willfulness. In Michigan, a legal malpractice judgment requires no greater a finding than that the conduct was negligent. *See* *Basic Foods Indust. v. Grant*, 107 Mich.App. 685, 310 N.W.2d 26, 28 (Mich.Ct.App.1981). Thus, the jury's finding of legal malpractice did not decide the issue of willful and malicious injury; it was not actually litigated. "[T]he jury's finding that [the attorney] acted with knowledge of a high probability of harm to his clients does not collaterally estop him from claiming that his actions did not constitute a willful and malicious injury." *In re Conte*, 33 F.3d 303, 307 (3d Cir.1994); *accord* *In re Kelly*, 182 B.R. 255 (9th Cir.BAP, 1995), *aff'd. by* *In re Kelly*, 100 F.3d 110 (9th Cir.1996) (state court judgment finding debtor liable for legal malpractice only amounted to a finding of negligence, therefore it was not properly used to find malicious and willful injury based on the doctrine of collateral estoppel); *Matter of Miller*, 156 F.3d 598 (5th Cir.1998) (collateral estoppel did not apply in § 523(a)(6) proceeding where state court found that misappropriation or misuse of employer's proprietary information proximately caused harm), *cert.*

-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*denied*, 526 U.S. 1016, 119 S.Ct. 1249, 143 L.Ed.2d 347 (1999), *and cert. denied*, 526 U.S. 1016, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999).

[11] Moreover, Campbell's request for a special interrogatory also failed to actually decide the issue of willful and malicious injury. First, the state court's refusal to give the instruction is not the equivalent of a summary judgment that Markowitz's actions were not willful. Campbell was not asking the judge to instruct the jury regarding any cause of action. Instead, her attorney asked for the question precisely because it had "to do with a concern about discharge in bankruptcy." (J.A. at 125). Therefore, the judge's ruling against presenting the special question was neither the equivalent of a summary judgment ruling nor a ruling that there were no facts to support an intentional tort claim. It was not a ruling on the merits. Instead, the ruling extends no farther than a ruling on the relevancy of the question to those particular proceedings. The state court recognized that a finding on the question was neither necessary nor essential to judgment in that case.

Second, the proposed question itself simply asked "whether or not Mr. Markowitz's *decision making* was intentional or willful." (J.A. at 125 (emphasis added)). This is not the same as asking whether Markowitz intended to cause injury. Even an affirmative answer by the jury to that or a similar question would not collaterally estop either side in subsequent litigation on the § 523(a)(6) issue.FN5 An answer to the **463** question posed would not resolve the § 523(a)(6) issue precisely because non-dischargeability requires more than an intentional decision but also an intent to do harm. *See Geiger*, 523 U.S. at ----, 118 S.Ct. at 977. Thus, a separate review of the facts in the bankruptcy discharge litigation was proper. There is no collateral estoppel.

FN5. In *Conte*, the jury answered the following interrogatory in the affirmative:
It has been admitted by Mr. Conte that as of June 1980 he was aware that his client's case

against Dr. Gerry Brown had been dismissed by the court. Do you find that he deliberately omitted informing his clients of the fact that their case was dismissed with knowledge of a high degree of probability of harm to Mr. and Mrs. Gautam and reckless indifference to the consequences of his omission?
*In re Conte*, 33 F.3d 303, 305 (3d Cir.1994). The Third Circuit ruled that the affirmative finding of the jury did not collaterally estop the attorney from claiming in the subsequent bankruptcy proceeding that his actions were not willful and malicious.

## IV.

[12] Next we consider Markowitz's claim that the bankruptcy court erred in denying his motion for summary judgment and granting Campbell's motion for summary judgment based on its finding that his conduct was "willful and malicious." We review a district court's order granting summary judgment de novo, and its findings of fact for clear error. *See Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Mich. Dep't of Natural Resources*, 141 F.3d 635, 639 (6th Cir.1998); *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996); *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996); *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622 (6th Cir.1996).

[13][14] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FN6 Fed.R.Civ.P. 56(c); *accord* *Terry Barr Sales Agency, Inc.*, 96 F.3d at 178; *Hartsel*, 87 F.3d at 799; *Holiday Inns, Inc.*, 86 F.3d at 622; *Atlantic Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 206 (6th Cir.1996). When reviewing a summary judgment decision, an appellate court must confine its review to the evidence as submitted to the district court. *Landefeld v. Marion Gen. Hosp.*, 994 F.2d 1178, 1181 (6th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455

Page 11

190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

Cir.1993); *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399, 405-06 (6th Cir.1992).

> FN6. These same rules of review also apply where the parties have filed cross-motions for summary judgment. *Atlantic Richfield Co.*, 84 F.3d at 206. The court must evaluate each motion on its own merit and draw inferences against the party whose motion is being considered. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994); *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991).

[15] Section 523(a)(6) of the Bankruptcy Code contains an exception to the dischargeability of debts. It provides:

(a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
...
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6). From the plain language of the statute, the judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt.

The recent decision by the Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), addressed the "pivotal question concerning the scope of the 'willful and malicious injury' exception" presented here: whether " § 523(a)(6)'s compass cover[s] acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury." *Id.* at ----, 118 S.Ct. at 976. At issue in Geiger was the dischargeability of a debt arising from a damages award for medical malpractice. Margaret Kawaauhau sought treatment from Dr. Geiger for a foot injury. Geiger admitted Kawaauhau to a hospital to attend to the risk of infection. Geiger knew that intravenous penicillin was more effective than

oral penicillin, but prescribed oral penicillin because he understood that the patient wanted to minimize costs. Geiger left on a **\*464** business trip and left Kawaauhau with other physicians. Although the other physicians had decided she should be transferred to an infectious disease specialist, Geiger canceled the order upon his return. He also discontinued all antibiotics, believing that the infection had subsided. Over the next few days, Kawaauhau's condition deteriorated and her right leg was amputated below the knee. Geiger intentionally rendered inadequate medical care by deliberately choosing less effective treatment in order to cut costs. *Id.* at ---- - ----, 118 S.Ct. at 976-77. The bankruptcy court determined that Geiger's treatment fell far below the appropriate standard of care and held the debt non-dischargeable. *In re Geiger*, 172 B.R. 916, 922-23 (Bankr.E.D.Mo.1994). Yet the Supreme Court held that even when actions fall so far below professional standards, they will not necessarily be "willful and malicious" and will not necessarily, therefore, be non-dischargeable under § 523(a)(6). *Geiger*, 523 U.S. at ----, 118 S.Ct. at 977.

[16] The Court held that "willful" means "voluntary," "intentional," or "deliberate."[FN7] *Id.* at ---- n. 3, 118 S.Ct. at 977 n. 3. As such, only acts done with the intent to cause injury-and not merely acts done intentionally-can cause willful and malicious injury. The Court explained its holding by discussing the importance of context:

> FN7. Citing BLACK'S LAW DICTIONARY 1434 (5th ed.1979); S.Rep. No. 95-989, p. 79 (1978), U.S.Code Cong. & Admin. News pp. 5787, 5864; H.R.Rep. No. 95595, p. 365 (1977), U.S.Code Cong. & Admin. News pp. 5963, 6320.

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
(Cite as: 190 F.3d 455)

Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964) (emphasis added).

*Id.* at ----, 118 S.Ct. at 977. The Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.[FN8] Nonetheless, from the Court's language and analysis in *Geiger*, we now hold that unless "the actor desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it,"Restatement (Second) of Torts § 8A, at 15 (1964), he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

> FN8. The Eighth Circuit, on the other hand, gave the Restatement greater attention in its opinion, equating § 523(a)(6) with intentional torts, defined as actions where the actor desires to cause injury or believes that injury is substantially certain to result from his acts. *Geiger v. Kawaauhau*, 113 F.3d 848, 852 (8th Cir.1997), *aff'd*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

Although the Sixth Circuit recognized a much broader definition of "willful and malicious" in *465*Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.1987)(holding that willful and malicious injury will occur when one intends the act regardless of whether he intends the consequence), "the formulation in *Perkins*... of the intent necessary to find a debt non-dischargeable under § 523(a)(6) has been overruled by the Supreme Court in *Geiger*."[FN9] *See In re Bullock-Williams*, 220 B.R. 345, 347 (6th Cir.BAP1998)(condominium owner's failure to pay fees to the association did not demonstrate the necessary intent to cause harm to the association when record indicated that the debtor thought the fees were being paid by either the Chapter 13 trustee or her children); *accordIn re Evans*, Nos. 98-60037, 98-6078, 1998 WL 404178 (Bankr.N.D.Ohio, 1998)("[*Geiger*] effectively overruled the Sixth Circuit's decision in *Perkins*...."). We agree. *See In re Abbo*, 168 F.3d 930 (6th Cir.1999)(adopting *Geiger* in affirming finding that a malicious prosecution judgment was non-dischargeable). In light of *Geiger*, the bankruptcy court's reliance on the *Perkins* standard (J.A. at 294) was incorrect. We hold that the *Perkins* standard for "willful and malicious injury" was effectively overruled by the Supreme Court in *Geiger* and we now expressly overrule that standard.

> FN9. "*Perkins* is cited by the Supreme Court in a list of cases that are contrary to the interpretation of § 523(a)(6) adopted in *Geiger*. Accordingly, we are constrained to apply the new standard enunciated by the Supreme Court in *Geiger*." *In re Bullock-Williams*, 220 B.R. at 347.

[17] It is clear throughout the bankruptcy court's opinion that its conclusion of non-dischargeability is based entirely on the now rejected *Perkins* standard. For example, the court states the following: "While [Markowitz] may not have 'intended' to harm Plaintiff, lack of such intent does not, under the case law, preclude a finding of willful and malicious. What is necessary, and what the Court finds to be present in very basic terms, is an intentional act which necessarily led to injury." The only factual findings actually made by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

Page 13

bankruptcy court were that Markowitz intended to do the acts, and those acts were causally related to Campbell's injury.

[18][19][20] On the basis of the stipulated record and those limited findings, we do not believe that there is a sufficient basis to show that Markowitz intended injury.[FN10] If we were to apply *Geiger* to the record before us, without more, Markowitz would be entitled to summary judgment. However, the intervening Supreme Court decision between the fact-finding stage and appeal requires a reevaluation of the case, an action properly conducted in the court below. As the record is currently constituted, the stipulation of facts by counsel reflects their reliance on proof as required by this Circuit under *Perkins* rather than the different standard now controlling under *Geiger*. In addition, had the bankruptcy court operated under the *Geiger* standard, it may have made additional credibility findings beyond those needed to evaluate the case under the *Perkins* standard. Therefore, because neither the parties nor the bankruptcy or district court were aware of the proper standard or proofs required under *Geiger*, we deem it *466 appropriate to remand the case to reconsider this matter and apply the *Geiger* standard.

> FN10. We note that under Geiger, the lack of an excuse or justification for his actions will not alone make Markowitz's debt non-dischargeable under § 523(a)(6). *See, e.g., In re Popa*, 140 F.3d 317 (1st Cir.1998)(gas station owner's failure to obtain worker's compensation insurance in violation of law, location of station in known, high crime area, and knowledge of recent robberies at station did not make him responsible for willful and malicious injury under § 523(a)(6) after night shift employee was severely beaten), *cert. denied*, 525 U.S. 869, 119 S.Ct. 163, 142 L.Ed.2d 133 (1998). Moreover, like Dr. Geiger who should have known under reasonable professional standards that his

treatment methods risked injury to his patient, *Geiger*, 523 U.S. at ---- - ----, 118 S.Ct. at 977-78, the mere fact that Markowitz should have known his decisions and actions put Carolyn Campbell at risk is also insufficient to establish a "willful and malicious injury." He must will or desire harm, or believe injury is substantially certain to occur as a result of his behavior.

### V.

Because we find further proceedings are necessary to determine whether discharge is appropriate, we do not address the issue regarding the proper calculation of damages.

### VI.

The judgment is **AFFIRMED IN PART**, to the extent we hold that jurisdiction was proper in the district court and remains so on appeal to this court, and the state malpractice action has no collateral estoppel effect. The judgment is **VACATED IN PART**, regarding the determination of the existence of willful and malicious injury; and the case is **REMANDED** for further proceedings to resolve the issue of dischargeability for willful and malicious injury in accordance with this opinion and *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

BOGGS, Circuit Judge, dissenting.
I would affirm the judgment of the district court based on the bankruptcy court's holding.

The court holds that the courts below applied the wrong legal standard, yet remands the case for additional factfinding. I believe that facts in the record, sufficient to affirm the judgment of the district court, support the judgments below, and we are not at liberty to disregard them in our deliberations.

We review the bankruptcy court's findings of fact for clear error, its understanding of the legal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
(Cite as: 190 F.3d 455)

standard for "willful and malicious" injury *de novo*, and its application of the standard to the facts *de novo*. If we determine that the factfinding below was not clearly erroneous, and that the proper legal standard applied to those facts indicates that Markowitz acted willfully and maliciously under § 523(a)(6) of the Bankruptcy Code, we must affirm the decision regardless of whether the courts below applied the correct legal standard.

### I

The court finds an error of law below: improper reliance on our decision in *Perkins* in light of the Supreme Court's later decision in *Geiger*. Regardless of the standard applied by the courts below, I believe that the facts supporting the bankruptcy court's holding require affirmance under *Geiger*.

In *Geiger*, the Court explicitly adopted the intentional tort standard, which requires "that the actor intend 'the consequences of the act,' not simply 'the act itself.' " *Id.* at ----, 118 S.Ct. at 977 (quoting Restatement (Second) of Torts § 8A, cmt. a, p. 15 (1964)).

The Restatement (Second) of Torts, quoted with approval in *Geiger*, explicitly states that actual desire to cause the harmful consequences is not required. "The word 'intent' is used throughout the Restatement ... to denote that the actor desires to cause consequences of his act, or that he *believes that the consequences are substantially certain to result from it.*" RESTATEMENT (SECOND) OF TORTS§ 8A (emphasis added). "If the actor knows that the consequences are certain, or substantially certain, to result from his act, ... he is treated by the law as if he had in fact desired to produce the result." RESTATEMENT (SECOND) OF TORTS§ 8A, comment b.

Markowitz committed an intentional tort if he believed that harm to Campbell was substantially certain to result from his action or failure to act. The parties stipulated to the accuracy of the state trial record, and that there were no disputed issues of material fact. After assessing these facts, the bankruptcy court held that Markowitz's actions were willful and malicious under § 523(a)(6), which I think is correct.

### *467 II

The record clearly shows that Markowitz changed his story about advising Campbell to respond to the Oakland County action. When he was sued, Markowitz denied that he advised Campbell not to respond to the Oakland action and declined responsibility for the results of the failure to defend the action. By the time of trial, Markowitz testified that he had recommended that course of action. Certainly, given Markowitz's about-face, the bankruptcy court's conclusion that Campbell's harm was not caused by a negligent strategic failure is "plausible in light of the record viewed in its entirety." Therefore, we cannot say on the record before us that it is clearly erroneous.

The parties stipulated that Markowitz knew that a default and default judgment would be entered if he failed to respond to the Oakland complaint; that he had read the Oakland County complaint and knew the relief sought by Mr. Campbell, and therefore the details of the default judgment that would be entered; that he made the decision not to respond in that action; that Campbell's husband was seeking to enforce a support order against Campbell; and that her wages were being garnished.

No inference to constructive knowledge is necessary. Markowitz *actually knew* that Campbell was being harmed by the Oakland County judgment. He knew that Campbell's husband was seeking to enforce a support order against Campbell. J.A. at 95. He also knew that her wages were being garnished. J.A. at 101-02, 104.[FN1] And while Markowitz acknowledges that he did respond to Campbell's concerns by asking the friend of the court not to enforce the Oakland County judgment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.3d 455                                                                                    Page 15
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P
**(Cite as: 190 F.3d 455)**

and by moving, after the judgment, to dismiss the Oakland County action, he did not follow through on either of these efforts.[FN2]

> FN1. Markowitz denied that he knew Campbell's wages were being garnished at the time that he was representing her. J.A. at 100-01. However, when asked about the contents of a letter that Campbell wrote to him during his representation, which criticized Markowitz for failing to get the Oakland County default judgment properly set aside and to "put an end to Fletcher's ability to continuously garnishee [Campbell's] wages," J.A. at 102, Markowitz testified that "[w]e had already discussed all of it," J.A. at 104.

> FN2. The friend of the court asked Markowitz to bring proof of the Wayne County action, which he never did. The Oakland County court granted Markowitz's motion to dismiss, but instead of writing a proposed order himself or objecting to Mr. Campbell's proposed order, Markowitz simply accepted Mr. Campbell's proposed order. As it turned out, the dismissal was vacated on appeal because, after judgment had been entered, Markowitz should have moved to set aside the judgment rather than to dismiss.

Egregious as they sound, these blunders are not, by themselves, evidence that Markowitz constructively intended harm to Campbell. However, Markowitz's erratic representation and his posturing about his actions refute his claim that he had the strategy he now claims to have had for the Campbell divorce (or, indeed, any strategy at all).

Markowitz knew that harm would come to Campbell as a result of his actions, and he did them anyway. Therefore, he must have believed that harm to Campbell was substantially certain to follow. His conduct satisfies the *Geiger* test and was properly held to be willful and malicious. In order to conclude that Markowitz's actions do not meet

the requirements of the *Geiger* test, one must set aside the bankruptcy court's assessment of the stipulated facts.

### III

We are not at liberty to hold that facts concerning whether Markowitz believed that his failure to act would have no effect, and consequently whether Markowitz did not believe that his actions were substantially certain to harm Campbell, have not been found. The bankruptcy court's judgment rests on its assessment of the facts based on the parties' stipulation that there were no disputed facts. Viewed in its entirety, the record supports the plausibility*468 of the bankruptcy court's assessment. Applying the *Geiger* standard to these facts, Campbell is entitled to summary judgment. Markowitz's actions were *not* merely severely poor strategy, they constituted an intentional tort.

I therefore respectfully dissent, and would affirm the judgment of the district court.

C.A.6 (Mich.),1999.
In re Markowitz
190 F.3d 455, 34 Bankr.Ct.Dec. 1316, 1999 Fed.App. 0343P

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

36 F.3d 1375                                                                                          Page 1
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
**(Cite as: 36 F.3d 1375)**

▷
Meyer v. Rigdon
C.A.7 (Ill.),1994.

United States Court of Appeals,Seventh Circuit.
Arthur MEYER (through his estate), Dorothy Wat-
son, Harold Nees, George Patterson, and Ross
Strauch (through the co-administrator of his Estate,
Arlene Long), as assignees of Federal Deposit In-
surance Corp., Plaintiffs-Appellees,
v.
Robert Albert RIGDON, Defendant-Appellant.
**No. 93-3743.**

Argued May 13, 1994.
Decided Sept. 22, 1994.

Adversary proceeding was brought for determina-
tion of dischargeability, in former bank president's
Chapter 7 case, of his debt on default judgment
entered against him for allowing bank to engage in
unsound lending practices. The Bankruptcy Court
for the Central District of Illinois entered judgment
in favor of plaintiff, and debtor appealed. The Dis-
trict Court, Harold Albert Baker, J., affirmed. On
further appeal, the Court of Appeals, Kanne, Circuit
Judge, held that: (1) traditional principles of com-
mon law collateral estoppel, pursuant to which de-
fault judgments and consent decrees generally are
not given collateral estoppel effect, were preempted
as regards default judgment previously entered
against debtor in litigation arising out of his fidu-
ciary fraud or defalcation with respect to depository
institution, and (2) debtor's obligation on default
judgment would be excepted from discharge, pursu-
ant to recently enacted bankruptcy statute.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review

        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 ☞3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear Error. Most Cited
Cases
Court of Appeals, like district court, reviews bank-
ruptcy court's factual findings for clear error and its
legal    conclusions    de    novo.    Fed.Rules
Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[2] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Bankruptcy court's construction of bankruptcy stat-
ute is legal conclusion, which Court of Appeals re-
views de novo.

**[3] Judgment 228 ☞636**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(A) Judgments Conclusive in Gener- al
            228k635 Courts or Other Tribunals Ren-
dering Judgment
                228k636 k. In General. Most Cited Cases
Doctrine of collateral estoppel applies in bank-
ruptcy nondischargeability proceedings.

**[4] Judgment 228 ☞634**

228 Judgment
    228XIV Conclusiveness of Adjudication

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
**(Cite as: 36 F.3d 1375)**

228XIV(A) Judgments Conclusive in Gener- al
228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases

**Judgment 228 ☞715(1)**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k715 Identity of Issues, in General
228k715(1) k. In General. Most Cited Cases
"Collateral estoppel" is judge-made doctrine that serves dual purpose of protecting litigants from burden of relitigating identical issue with same party or his privy and of promoting judicial economy by preventing needless litigation.

**[5] Judgment 228 ☞634**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in Gener- al
228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases
For judgment to be given collateral estoppel effect, issue sought to be precluded must be the same as that involved in prior litigation, issue must have been actually litigated in prior litigation, determination of issue must have been essential to final judgment in prior action, and party against whom estoppel is invoked must have been fully represented in prior action.

**[6] Judgment 228 ☞652**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in Gener- al
228k652 k. Judgment by Default. Most Cited Cases

Normally, default judgment is not given preclusive effect under collateral estoppel doctrine, since no issue is "actually litigated" prior to entry of default judgment.

**[7] Judgment 228 ☞651**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in Gener- al
228k651 k. Judgment by Confession or on Consent or Offer. Most Cited Cases
Consent decrees, while settling issue definitively between parties, normally do not support invocation of collateral estoppel, since issues underlying consent judgment generally are neither actually litigated nor essential to judgment.

**[8] Judgment 228 ☞651**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in Gener- al
228k651 k. Judgment by Confession or on Consent or Offer. Most Cited Cases
Consent decree may be given collateral estoppel effect only if parties could reasonably have foreseen the conclusive effect of their actions.

**[9] Compromise and Settlement 89 ☞17(1)**

89 Compromise and Settlement
89I In General
89k14 Operation and Effect
89k17 Conclusiveness
89k17(1) k. In General. Most Cited Cases
Settlement agreements not approved by court are not given issue preclusive effect.

**[10] Administrative Law and Procedure 15A ☞501**

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375                                                    Page 3
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
**(Cite as: 36 F.3d 1375)**

ive Agencies, Officers and Agents
    15AIV(D) Hearings and Adjudications
        15Ak501 k. Res Judicata. Most Cited Cases
Administrative agency decisions will be given col-
lateral estoppel effect only if original action was
properly before agency, if same disputed issues of
fact are before court as were before agency, if
agency acted in judicial capacity, and if parties had
adequate opportunity to litigate issue before agency.

**[11] Bankruptcy 51 ☜⇒3376(3)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
                  51k3376(2) Fiduciaries and Fidu-
ciary Capacity
                    51k3376(3) k. In General. Most
Cited Cases
    (Formerly 51k3357(2.1))
Traditional principles of common law collateral es-
toppel, pursuant to which default judgments and
consent decrees are generally not given collateral
estoppel effect, are preempted as regards default
judgments and consent decrees entered in litigation
arising out of debtor's fiduciary fraud or defalcation
with respect to any depository institution or insured
credit union; bankruptcy statute excepting from dis-
charge any debt provided in such judgments or con-
sent orders rendered such judgment debts per se
nondischargeable, to the extent that they were
based on debtor's acts of fiduciary fraud or defalca-
tion toward any such depository institution or in-
sured credit union. Bankr.Code, 11 U.S.C.A. §
523(a)(11).

**[12] Bankruptcy 51 ☜⇒3376(3)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged

            51X(C)5 Torts and Crimes
                51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
                  51k3376(2) Fiduciaries and Fidu-
ciary Capacity
                    51k3376(3) k. In General. Most
Cited Cases
    (Formerly 51k3357(2.1))
Existence of fiduciary relationship, of kind required
to trigger statutory exception to discharge, was
question of federal law. Bankr.Code, 11 U.S.C.A. §
523(a)(11).

**[13] Bankruptcy 51 ☜⇒3376(3)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
                  51k3376(2) Fiduciaries and Fidu-
ciary Capacity
                    51k3376(3) k. In General. Most
Cited Cases
    (Formerly 51k3357(2.1))
Bank president and member of its board of direct-
ors, who also owned controlling interest in bank,
acted in "fiduciary capacity" with respect to bank
and its shareholders, within meaning of statutory
exception to discharge. Bankr.Code, 11 U.S.C.A. §
523(a)(11).

**[14] Bankruptcy 51 ☜⇒3376(5)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
                  51k3376(5) k. Defalcation. Most
Cited Cases
    (Formerly 51k3357(4))
"Defalcation," within meaning of statutory excep-
tion to discharge, requires more than mere negli-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
**(Cite as: 36 F.3d 1375)**

gent breach of fiduciary duty. Bankr.Code, 11
U.S.C.A. § 523(a)(11).

**[15] Bankruptcy 51 ☞3376(5)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)5 Torts and Crimes
            51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
               51k3376(5)  k.  Defalcation.  Most
Cited Cases
   (Formerly 51k3357(4))

**Bankruptcy 51 ☞3376(6)**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)5 Torts and Crimes
            51k3376 Fraud or Defalcation in Fidu-
ciary Capacity
               51k3376(6)  k.  Fraud.  Most  Cited
Cases
   (Formerly 51k3357(5))
Former bank president's obligation on default judg-
ment entered against him in lawsuit arising out of
his approval and disbursement of loans without re-
quiring adequate information about borrower, guar-
antor and/or potential collateral, even though he
had previously been advised by federal and state
banking authorities that such practices were imper-
missible, would be excepted from discharge, as
debt provided in final judgment entered against
former president on account of his fiduciary fraud
or defalcation with respect to depository institution.
Bankr.Code, 11 U.S.C.A. § 523(a)(11).

**[16] Bankruptcy 51 ☞3341**

51 Bankruptcy
   51X Discharge
      51X(C) Debts and Liabilities Discharged
         51X(C)1 In General
            51k3341  k.  In  General.  Most  Cited

Cases
Statutory exceptions to dischargeability of debts are
strictly construed against objecting creditor and in
favor of debtor. Bankr.Code, 11 U.S.C.A. § 523(a).

**\*1377** George Plews (argued), Donn H. Wray,
Plews & Shadley, Indianapolis, IN, for appellees.
William Garrison (argued), Jeanette E. Bahnke,
Saikley, Garrison & Colombo, Danville, IL, for ap-
pellant.

Before CUDAHY, KANNE, and ROVNER, Circuit
Judges.

KANNE, Circuit Judge.
   Robert Rigdon was the president of People's
State Bank of Clay County, Indiana. He was also a
member of the Bank's board of directors and owned
a controlling interest in the Bank. In August of
1984, the Federal Deposit Insurance Corporation
("FDIC") and the Indiana Department of Financial
Institutions determined that the Bank was insolvent.
Thereafter, the Bank was closed and the FDIC was
appointed receiver of the Bank pursuant to 12
U.S.C. § 1821(e). The FDIC then brought suit
against Rigdon and the other members of the
Bank's board of directors-Arthur Meyer, Dorothy
Watson, Harold Nees, George Patterson, and Ross
Strauch and Arlene Long as co-administrators of
the estate of Ross Strauch-in the United States Dis-
trict Court for the Southern District of Indiana. The
FDIC's complaint alleged, *inter alia,* that the de-
fendants breached their fiduciary duty to the Bank
in "managing, conducting, supervising, and direct-
ing the Bank's making, supervising and collecting
of loans." The FDIC's complaint further itemized
specific instances in which the defendants had al-
legedly breached their fiduciary responsibilities.

   The district court entered a default judgment
against Rigdon in the FDIC case because he failed
to respond to the complaint. Thereafter, the FDIC
assigned its default judgment to Rigdon's co-
defendants ("Meyer Defendants") under the terms
of a settlement agreement dated July 24, 1989. The
Meyer Defendants subsequently filed a motion in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Indiana federal court requesting the court enter a final money judgment against Rigdon based on the default judgment. The district court granted the motion and entered a money judgment against Rigdon in the amount of $1,613,181.43.

In February of 1992, Rigdon filed a bankruptcy petition under chapter seven of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of Illinois. Shortly thereafter, the Meyer Defendants filed a complaint in the bankruptcy court seeking a determination as to whether Rigdon could discharge his debt arising from the Indiana federal court judgment. The Meyer Defendants subsequently filed a motion*1378 for summary judgment in the Bankruptcy Court, arguing, *inter alia,* that Rigdon's debt was not dischargeable under 11 U.S.C. § 523(a)(11). That provision provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

(11) provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any state, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union.

Rigdon argued that section 523(a)(11) was not controlling because the judgment at issue was a default judgment and under the prevailing case law, default judgments are not entitled to preclusive effect in discharge exception proceedings. The bankruptcy court granted the Meyer Defendant's motion for summary judgment. According to the bankruptcy court, the default judgment "fits within the definition of 'any final judgment' under § 523(a)(11)." The court stated that "had Congress intended to exempt default judgment[s] obtained by Federal depository regulatory institutions from the scope of the term '*any* final judgment,' it could eas-

ily have done so by wording the statute differ- ently."

Rigdon appealed to the district court, again claiming that section 523(a)(11) does not apply to default judgments. Rigdon further argued that section 523(a)(11) was inapplicable because the FDIC's complaint did not allege that he had committed acts of "defalcation." The district court rejected Rigdon's arguments. First, the court found that the "plain, straightforward and unqualified language of § 523(a)(11)" dictates the outcome of the dischargeability issue and prevents relitigation of the issue in either the bankruptcy court or the district court. Second, the court found that the word "defalcation" encompasses "the failure to carry out fiduciary duties," which is precisely what the FDIC's complaint charged. Rigdon now appeals to this court.

*Discussion*

[1][2] We, like the district court, review the bankruptcy court's factual findings for clear error and its legal conclusions *de novo. In re Wiredyne, Inc.,* 3 F.3d 1125, 1126 (7th Cir.1993). The proper construction of section 523(a)(11) is a legal issue which we review *de novo. Oviawe v. INS,* 853 F.2d 1428, 1431 (7th Cir.1988).

*Applicability of section 523(a)(11)*

[3] The Bankruptcy Code delineates several exceptions to the normal rule that all debts are dischargeable in bankruptcy. For instance, under section 523(a)(4) a debtor may not discharge any debt resulting from "fraud or defalcation while acting in a fiduciary capacity...." The bankruptcy court normally makes an independent determination as to whether a debt is excepted from discharge under section 523(a)(4). *See In re Bercier,* 934 F.2d 689, 692 (5th Cir.1991) ("The bankruptcy court has exclusive jurisdiction to determine dischargeability of these debts."). However, if a court of competent jurisdiction has previously entered judgment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
(Cite as: 36 F.3d 1375)

Page 6

against the debtor for "fraud or defalcation while acting in a fiduciary capacity," the debtor may not relitigate the underlying facts in the bankruptcy court. In other words, the doctrine of collateral estoppel [FN1] applies in bankruptcy discharge exception *1379 proceedings. *Klingman v. Levinson,* 831 F.2d 1292, 1294-1295 (7th Cir.1987); *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991) ("Our prior cases have suggested, but have not formally held, that the principles of collateral estoppel apply in bankruptcy proceedings under the current Bankruptcy Code.... We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).").

> FN1. As used in this opinion, "collateral estoppel" is synonymous with the term "issue preclusion," " 'which refers to the effect of a judgment in foreclosing litigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in the initial action.' " *LaSalle Nat'l Bank v. County of DuPage,* 856 F.2d 925, 930 n. 2 (7th Cir.1988), *cert. denied,*489 U.S. 1081, 109 S.Ct. 1536, 103 L.Ed.2d 840 (1989) (quoting *Kirk v. Board of Educ.,* 811 F.2d 347, 351 n. 7 (7th Cir.1987)). The term "collateral estoppel" must be distinguished from the terms "res judicata" or "claim preclusion," which refer to " 'the preclusive effect of a judgment in foreclosing litigation of matters that were or could have been raised in an earlier suit.' " *Id.* The Supreme Court has held that res judicata does not apply in bankruptcy discharge exception proceedings. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

[4][5] Collateral estoppel is a judge-made doctrine that serves the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless lit-

igation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (citation omitted). For collateral estoppel to apply, four elements must be met: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action." *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.,* 914 F.2d 900, 906 (7th Cir.1990).

[6] As Rigdon correctly points out, a default judgment is normally not given preclusive effect under the collateral estoppel doctrine because no issue has been "actually litigated." *In re Cassidy,* 892 F.2d 637, 640 n. 1 (7th Cir.), *cert. denied,*498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). However, because collateral estoppel is a common law creature, it can, of course, be pre-empted by Congressional action.

Pre-emption is essentially an issue of Congressional intent. *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985) ("The purpose of Congress is the ultimate touchstone.") (citation omitted). In determining Congress' intent, we initially focus on the state of the law as it existed prior to the passage of section 523(a)(11). Under section 523(a)(4), a debtor was already prevented from discharging any debt "for fraud or defalcation while acting in a fiduciary capacity." Section 523(a)(11) also prevents a debtor from discharging a debt arising from his "fraud or defalcation while acting in a fiduciary capacity." Section 523(a)(11) is narrower than section 523(a)(4), in that it applies only to acts of fraud or "defalcation" "committed with respect to any depository institution or insured credit union." Nonetheless, as is readily apparent, any debt dischargeable under section 523(a)(11) was already dischargeable under section 523(a)(4). Why then did Congress go to the trouble of enacting section 523(a)(11)?

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375

36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
**(Cite as: 36 F.3d 1375)**

Page 7

[7][8][9] The simple answer is that Congress wanted to expand the preclusive effect given certain prior actions in bankruptcy discharge exception proceedings. In order to invoke collateral estoppel, an issue must have been "actually litigated" in the prior action. Accordingly, default judgments are not given preclusive effect in subsequent court proceedings. Nor are most consent decrees. Consent decrees, "while settling the issue definitively between the parties, normally do not support an invocation of collateral estoppel." *La Preferida,* 914 F.2d at 906 (citations omitted). "The rationale behind this general rule is that issues underlying a consent judgment generally are neither actually litigated nor essential to the judgment." *Id.* (citation omitted). Collateral estoppel may only be applied to consent decrees if " 'the parties could reasonably have foreseen the conclusive effect of their actions.' " *Klingman,* 831 F.2d at 1296 (quoting 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.444[1], at 794 (2d ed. 1984)). *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4443, at 382 (1981) ("Issue preclusion does not attach unless it is clearly shown that the parties intended that the issue be foreclosed in other litigation."). Similarly, settlement agreements not approved by a court are not given preclusive effect.

[10] Administrative agency decisions will only be given preclusive effect under the collateral estoppel doctrine if (1) the original action was properly before the agency, (2) the same disputed issues of fact are before the court as were before the agency, (3) the *1380 agency acted in a judicial capacity, and (4) the parties had an adequate opportunity to litigate the issue before the agency. *Frye v. United Steelworkers of Am.,* 767 F.2d 1216, 1220 (7th Cir.), *cert. denied,* 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985); *Lightsey v. Harding, Dahm & Co., Inc.,* 623 F.2d 1219, 1221 (7th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 855, 66 L.Ed.2d 799 (1981).

[11] The plain language of section 523(a)(11),

however, alters the common law collateral estoppel rules with respect to default judgments, settlement agreements, and certain administrative agency decisions. Section 523(a)(11) provides that a debt arising from the debtor's breach of fiduciary duty to a financial institution is not dischargeable if that debt is provided in "*any* final judgment, unreviewable order, or consent decree or order" entered in *any* federal or state court; "any settlement agreement entered into by the debtor;" and any order "issued by a Federal depository institutions regulatory agency." (emphasis added). The plain language of section 523(a)(11) requires the bankruptcy court give preclusive effect to dispositions, like default judgments (a default judgment is *any* judgment) and non-court approved settlement agreements, that would not be given preclusive effect under the common law. Therefore, we must conclude that Congress intended to preempt the common law by enacting section 523(a)(11).

Any other interpretation would render section 523(a)(11) a redundancy. Section 523(a)(11) prevents the discharge of debts arising from the same substantive conduct as section 523(a)(4), i.e., "fraud or defalcation while acting in a fiduciary capacity." If section 523(a)(11) also preserves the common law collateral estoppel doctrine, as Rigdon contends, it would be virtually identical in effect to section 523(a)(4). Congress could not have meant for such a specific provision to be mere surplusage. *See United States v. Dean,* 908 F.2d 215, 217 (7th Cir.1990), *cert. denied,* 501 U.S. 1206, 111 S.Ct. 2801, 115 L.Ed.2d 974 (1991) (citing *United States v. Franz,* 886 F.2d 973, 978 (7th Cir.1989)). We do not believe that Congress, in enacting section 523(a)(11), engaged in a "meaningless legislative exercise." *See Brundidge Banking Co. v. Pike County Agric. Stabilization & Conservation Comm.,* 899 F.2d 1154, 1163 (11th Cir.1990).

Our reading of section 523(a)(11) is supported by its legislative history. Congressman Jack Brooks, Chairman of the House Judiciary Committee, made the following statement during the floor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
(Cite as: 36 F.3d 1375)

Page 8

debate on section 523(a)(11) and (12): FN2

> FN2. New section 523(a)(12) provides: "(a) A discharge under sections 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-(12) for malicious or reckless failure to fulfill any commitment by the debtor to a Federal depository institutions regulatory agency to maintain the capital of an insured depository institution, except that this paragraph shall not extend any such commitment which would otherwise be terminated due to any act of such agency."

The second part of the bill I would like to briefly mention is the savings and loan section. These are changes to the Bankruptcy Code which close off the bankruptcy escape hatch for bank and thrift insiders whose acts of financial fraud and malice will end up adding perhaps half a trillion dollars to the Federal debt.... *Banking regulators will now be able to prosecute these con artists with the needed confidence that the victories won in enforcement proceedings will not be nullified in bankruptcy proceedings.*
136 Cong.Rec. H13288, 13289 (daily ed. October 27, 1990) (statement of Rep. Brooks) (emphasis added). Of course, the only way a banking regulator's victory could be nullified is if a debtor is permitted to discharge a debt arising from his misdeeds. That is a possibility under section 523(a)(4) because the bankruptcy court is only required to give preclusive effect to a final judgment on the merits. Before Congress enacted section 523(a)(11), a bank officer could enter into a private settlement agreement with the FDIC, for instance, admit that he had committed acts of fraud, and still have the debt arising from his fraud discharged in bankruptcy. By enacting section 523(a)(11), Congress intended to limit the bankruptcy court's ability to nullify regulatory victories *1381 through its independent power to determine dischargeability.

Our research has revealed only one case inter-

preting section 523(a)(11) and that came from a bankruptcy court in Florida. *In re Harris,* 135 B.R. 434 (Bankr.S.D.Fla.1992). In that case, Bruce N. Harris filed a bankruptcy petition pursuant to chapter seven of the Bankruptcy Code. The National Credit Union Administrative Board ("NCUAB") FN3 subsequently commenced an adversary proceeding ("Adversary") in the bankruptcy court seeking to have Harris' potential debt to it declared non-dischargeable under section 523(a)(11). NCUAB had previously commenced a civil action against Harris in the United States District Court for the District of Massachusetts alleging that Harris, while serving in various positions on the Board of Directors of Barnstable Community Federal Credit Union, "participated in fraudulent schemes in violation of state and federal criminal laws, and the Federal Credit Union Act." *Id.* at 435. The district court case had not yet been resolved by the time Harris filed his bankruptcy petition. Consequently, NCUAB sought a stay of the bankruptcy proceedings until that case had been decided.

> FN3. The National Credit Union Administration is an independent agency of the executive branch managed by the NCUAB. *See* 12 U.S.C. § 1752a.

The bankruptcy court noted that section 523(a)(11) had recently been added to the bankruptcy code. According to the court, "[i]ts obvious aim, coming as it did in the midst of a national banking crisis, is to streamline litigation against the scoundrel bankers, and prevent the use of the Bankruptcy Court as a shield against such litigation." *Id.* at 436. In granting the stay, the court stated the following:
Arguably, 523(a)(11) adds little to the existing state of the law regarding nondischargeability. Since fraud can be determined to be nondischargeable pursuant to 523(a)(2) and (4), the fraudulent banker would in most cases be prevented from receiving a discharge of the resulting debt. *The difference is that the issue would have to be proven in the bankruptcy court.* Further, there is significant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
(Cite as: 36 F.3d 1375)

Page 9

case law relative to if and when pre bankruptcy judgments based on fraud govern the issue of dischargeability. *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) [ holding that the doctrine of *res judicata,* as opposed to collateral estoppel, does not apply in discharge exception proceedings) ]; *In re Neely,* 125 B.R. 392 ( [Bankr.] S.D.N.Y.1991).

Statutory construction requires this Court to assume that Congress knew the state of the law under 523(a)(2) and (4) when it nevertheless decided to add Section 523(a)(11) to the Code. This Court's duty is to enforce that section as adopted by Congress.

This court believes that the language of 523(a)(11) requires that the motion at issue be granted and the Adversary stayed. To construe it otherwise would be to render it essentially meaningless and to cause duplicative litigation which would be wasteful of the resources of the Court and the parties....

Conducting a full trial on dischargeability in this forum will essentially require all the proofs which will ultimately be introduced in the District Court Case. This would not only be inconvenient to both parties and a significant waste of judicial economy, but it would also raise the specter of inconsistent judgments.

*Id.* We agree that in order to give meaning to section 523(a)(11) it must be read as altering the common law rules concerning the preclusive effect given certain actions in bankruptcy discharge exception proceedings. We also agree that Congress' intent in passing section 523(a)(11) was to prevent "inconsistent judgments."

However, we do not agree with the bankruptcy judge's subsequent statement in *Harris* that, "[f]ollowing a judgment in the District Court Case, this Court may accept or request, in its discretion, further evidence from the parties to supplement the record of the District Court Case." *Id.* at 437. Under the plain language of section 523(a)(11), the bankruptcy court is required to give preclusive effect to,

*inter alia,* certain final judgments entered by federal courts. If the debt results from a final judgment arising from **\*1382** the debtor's fraud or "defalcation" while acting in fiduciary capacity of a depository institution, the debt is *per se* nondischargeable in bankruptcy. No additional evidence need or may be submitted to the bankruptcy court-the debtor is estopped from challenging the nondischargeability of his debt.

In summary, we conclude that Congress preempted the common law collateral estoppel doctrine when it enacted section 523(a)(11). Under the plain language of that section, *any* final judgment, including default judgments, must be given preclusive effect so long as they arise from the debtor's fraud or "defalcation" while acting in a fiduciary capacity for a financial institution. Accordingly, the only issue left for us to consider is whether the default judgment entered against Rigdon arose from "any act of fraud or defalcation while acting in a fiduciary capacity."

*Fiduciary Capacity and Defalcation*

The FDIC's complaint alleged that Rigdon breached his fiduciary duty to the Bank "[i]n managing, conducting, supervising, and directing the bank's making, supervising and collection of loans...." Because of Rigdon's conduct, the FDIC alleged that it had suffered losses in its capacity as receiver of the Bank "due to nonpayment and default by debtors and guarantors on imprudently made loans."

1. Fiduciary Duty

[12][13] The existence of a fiduciary relationship is a question of federal law under section 523(a)(11). *See In re Angelle,* 610 F.2d 1335, 1341 (5th Cir.1980). Under 11 U.S.C. § 523(e), "[a]ny institution-affiliated party of a depository institution or insured credit union shall be considered to be acting in a fiduciary capacity" for the purposes of section 523(a)(11). The Bankruptcy Code adopts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the banking law definition of institution-affiliated party. 11 U.S.C. § 101(33)(a). That law, the Federal Deposit Insurance Act, defines institution-affiliated party as:

(1) any *director,* officer, employee, or *controlling stockholder* (other than a bank holding company) of, or agent for, an insured depository institution....

12 U.S.C. § 1813(u) (emphasis added). Section 523(e) may not be applicable to this case, however, because it was enacted at least six years after Rigdon ceased to be member of the Bank's Board of Directors. Yet we need not decide whether Congress intended for section 523(e) to be applied retroactively because "state law ... may create fiduciary status in an officer which is cognizable in bankruptcy proceedings...." *In re Long,* 774 F.2d 875, 878 (8th Cir.1985). In Indiana, a director owes a fiduciary duty to the corporation and its shareholders. *See Yerke v. Batman,* 176 Ind.App. 672, 376 N.E.2d 1211, 1214 (1978) ("It is correct ... that, concerning matters affecting the general well being of the corporation, the officers and directors are fiduciaries to the corporation and to the shareholders of the corporation."); *Griffin v. Carmel Bank & Trust Co.,* 510 N.E.2d 178, 182 (Ind.Ct.App.1987) ("It needs no elaborate citation of authority to demonstrate that directors and officers of a corporation act in a fiduciary capacity, and their acts must be for the benefit of the corporation."); *see also In re Marchiando,* 13 F.3d 1111, 1115-1116 (7th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994) (recognizing in dicta that a director owes a fiduciary duty to the corporation and its shareholders for the purposes of section 523(a)(4)). Therefore, Rigdon was acting in a fiduciary capacity with respect to the Bank and its shareholders.

2. Defalcation

[14][15] Rigdon contends that the FDIC's complaint does not allege that he engaged in acts of "defalcation" within the meaning of section 523(a)(11). Specifically, Rigdon argues that mere acts of negligence are not "defalcations." "Defalcation" is not defined in the Bankruptcy Code. Nor does the legislative history of section 523(a)(11) shed any light on congressional intent as to how it should be interpreted. However, the term "defalcation" has been used in the Bankruptcy Code since 1841. *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511 (2d Cir.1937). Therefore, we can assume that Congress intended to give the term "defalcation," as it is used in section 523(a)(11), the same meaning that courts have given it in *1383 interpreting other provisions of the Bankruptcy Code.

The leading case defining "defalcation" is *Central Hanover Bank & Trust Co. v. Herbst.* In that case, Judge Learned Hand noted that "[c]olloquially perhaps the word, 'defalcation,' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts.... Whatever was the original meaning of 'defalcation,' it must here have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.' " *Id.* at 511. The court went on to state, however, that "[w]e do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; in *[In] re Bernard,* 87 F.2d 705, 707 [ (2nd. Cir.1937) ], we said that 'the misappropriation must be due to a known breach of duty, and not to mere negligence or mistake.' Although that word [misappropriation] probably carries a larger implication of misconduct than 'defalcation,' 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does." *Id.* at 512.

In interpreting *Herbst,* courts have split over the question of whether mere negligent acts may be "defalcations." In *In re Johnson,* 691 F.2d 249 (6th Cir.1982), the court adopted an "objective standard for finding a defalcation." *Id.* at 255. Under this standard, the bankruptcy petitioner is charged with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

knowledge of the law and his intent or motive is irrelevant in determining whether a debt is dischargeable. According to the court, "creating a debt by breaching a fiduciary duty is a sufficiently bad act to invoke the section 17(a)(4) exception even without a subjective mental state evidencing intent to breach a known fiduciary duty or bad faith in doing so." *Id.* at 256. Nonetheless, the court held that "mere negligence or mistake of fact" is insufficient to constitute a "defalcation." *Id.* at 257.

In *Carey Lumber Co. v. Bell,* 615 F.2d 370 (5th Cir.1980), the Fifth Circuit interpreted the term "misappropriation" as it was used in section 17(a)(4), the predecessor of section 523(a)(4). In that case, the bankruptcy petitioner argued that in order for a debt to be excepted from discharge under section 17(a)(4), it would have to be shown that he "intentionally diverted, stole, or misappropriated funds...." *Id.* at 375. The petitioner relied on language in *In re Bernard,* 87 F.2d 705 (2d Cir.1937), "to the effect that misappropriation under section 17(a)(4) 'must be due to a known breach of the duty, and not to mere negligence or mistake.' " *Carey Lumber Co.,* 615 F.2d at 375-376 (quoting *Bernard,* 87 F.2d at 707). The court initially held that, despite the language in *In re Bernard* that a misappropriation "must be due to a known breach of the duty," the petitioner is "charged with knowledge of his legal duties." *Id.* at 376. The court also went on to address the issue of whether a misappropriation may occur through negligent conduct:

Moreover, there is doubt as to the continued validity of the dicta in *In re Bernard* that misappropriation under section 17(a)(4) may not be found on the basis of "mere negligence or mistake." In *In re Hammond,* [98 F.2d 703 (2d Cir.1938), *cert. denied,*305 U.S. 646, 59 S.Ct. 149, 83 L.Ed. 418 (1938) ] supra, a debt incurred by a bankrupt corporate director who had unlawfully taken advantage of a corporate opportunity that the corporation had been financially unable to take advantage of was held nondischargeable in bankruptcy under section 17(a)(4), despite a complete absence of evidence that the director's wrongdoing had been intentional.

More recently, in *Matter of Kawczynski,* supra, the court wrote that " '[d]efalcation' has been interpreted by the Second Circuit to include innocent defaults." 442 F.Supp. [413] at 418 [ (W.D.N.Y.1977) ]. Thus there is no requirement that a misappropriation must be shown to have been intentional in order to be covered by section 17(a)(4).

*Id.*

The Fifth Circuit more recently defined the term "defalcation" within the meaning of section 523(a)(4) as "a willful neglect of duty, even if not accompanied by a fraud or embezzlement." *In re Moreno,* 892 F.2d 417, 421 (5th Cir.1990) (citing L. King, 3 *Collier on Bankruptcy* ¶ 523.14 at 523-93 to 523-95 (15th ed. 1988)); *see also* *1384In re Bennett,* 989 F.2d 779 (5th Cir.), *cert. denied,*510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993); *Matter of Davis,* 3 F.3d 113, 115 (5th Cir.1993) (citing, *inter alia, Carey Lumber,* 615 F.2d at 375-376) ("Defalcation includes willful neglects of duty unaccompanied by fraud or embezzlement.").

By using the word "willful," the Fifth Circuit has put into question the validity of the *Carey Lumber* dicta concerning the issue of whether a negligent act may be a "defalcation." Black's Law Dictionary 1599 (6th ed. 1990) defines "willful" as "[p]roceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." According to Black's, "[a] willful act differs essentially from a negligent act. The one is positive and the other negative." *Id.*

A bankruptcy court in the Fifth Circuit recently tried to reconcile *Matter of Moreno* and *Carey Lumber. See In re Gaubert,* 149 B.R. 819 (Bankr.E.D.Tex.1992). The *Gaubert* court rejected an argument made by the FDIC, based on *In re Chavez,* 140 B.R. 413 (Bankr.W.D.Tex.1992), that a mere breach of fiduciary duty meets the require-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
(Cite as: 36 F.3d 1375)

ment for establishing a "defalcation." The court re-conciled *Moreno* and *Carey Lumber* in the follow-ing manner:

> As a mere breach of fiduciary duty is negligent, the *Moreno* court's use of the term "willful" takes mere breaches of duty out of the defalcation cat-egory. On the other side, the *Carey Lumber* de-cision demonstrates that a standard that is less than intent is appropriate. It is consistent with the term willful and the purposes of the Bankruptcy Code to impose a standard of recklessness.

*Gaubert,* 149 B.R. at 827.

The Eleventh Circuit has also recently ad-dressed the perplexing "defalcation" question. In *Quaif v. Johnson,* 4 F.3d 950 (11th Cir.1993), the court stated the following:

> "Defalcation" refers to a failure to produce funds entrusted to a fiduciary. *In re Alvey,* 56 B.R. 170 (Bankr.W.D.Ky.1985). However, the precise meaning of "defalcation" for purposes of § 523(a)(4) has never been entirely clear. *[In re] Turner,* 134 B.R. 646 at 657 [ (Bkrtcy.N.D.Okl.1991) ]. An early, and perhaps the best, analysis of this question is that of Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2nd Cir.1937). Judge Hand concluded that while a purely innocent mis-take by the fiduciary may be dischargeable, a "defalcation" for purposes of this statute does not have to rise to the level of "fraud," "embezzlement," or even "misappropriation." *Id.* at 512. Some cases have read the term even more broadly, stating that even a purely innocent party can be deemed to have committed a defalcation for purposes of § 523(a)(4). *See [In re] McCormick,* 70 B.R. [49] at 51 [ (Bkrtcy.W.D.Pa.1987) ]; *American Ins. Co. v. Lucas,* 41 B.R. 923 (W.D.Pa.1984).

*Id.* at 955. The Eleventh Circuit held that the conduct at issue in *Quaif* "was far more than an in-nocent mistake or even negligence." *Id.* Numerous district and bankruptcy courts have also addressed the question of whether negligent acts may be "defalcations." Most have concluded that they

FN4

FN4. *See, e.g., Laughter v. Speight,* 167 B.R. 891, 895 (W.D.Ark.1993) (quoting *In re Oot,* 112 B.R. 497 (Bankr.N.D.N.Y.1989)) ("Defalcation may be established even though debtor's failure to account for money he received while acting in a fiduciary capacity was through ignorance or negligence"); *In re Hatfield,* C-90-0477 MHP, 1991 WL 498925, at *3-4, 1991 U.S.Dist. LEXIS 7382, at *8, 9 (N.D.Cal.1991), *aff'd,* 976 F.2d 736 (9th Cir.1992) (quoting *In re Wolfington,* 47 B.R. 762, 764 (Bankr.E.D.Pa.1985)) (" 'Defalcation' is broadly defined to include 'the failure of a fiduciary to account for money he received in his fiduciary capa-city' regardless of the fact that such failure may have resulted from ignorance or negli-gence."); *In re Failing,* 124 B.R. 340, 344 (W.D.Okla.1989) (citing *In re Cowley,* 35 B.R. 526, 529 (Bankr.D.Kan.1983)) ("Defalcation may also result from the debtor's negligence or ignorance."); *Kwiat v. Doucette,* 81 B.R. 184, 190 (D.Mass.1987) (quoting *In re Gans,* 75 B.R. 474, 490 (Bankr.S.D.N.Y.1987)) ("Whereas fraud under the Bankruptcy Code 'refers to positive fraud, involving moral turpitude,' defalcation is broadly defined to include 'the failure of a fidu-ciary to account for money he received in his fiduciary capacity' regardless of the fact that such failure may have resulted from ignorance or negligence."); *In re Smith,* 72 B.R. 61, 63 (N.D.Iowa 1987) (citing *In re Cowley,* 35 B.R. 526, 529 (Bankr.D.Kan.1983)) ("Defalcation in-cludes a broad range of misfeasance: ... It is the slightest misconduct, and it may not involve misconduct at all. Negligence or ignorance may be defalcation...."). *But see, e.g., In re Martin,* 161 B.R. 672 (9th Cir. BAP 1993) ("Because a defalcation re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

36 F.3d 1375
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119
(Cite as: 36 F.3d 1375)

quires more than a mere failure to use ordinary care...."); *In re Reed,* 155 B.R. 169, 172 n. 5 (Bankr.S.D.Ohio 1993); *In re Stewart,* 123 B.R. 817, 819 (Bankr.W.D.Tenn.1991).

[16] Nonetheless, we agree with the Sixth Circuit (and possibly the Fifth) that a **\*1385** mere negligent breach of a fiduciary duty is *not* a "defalcation" under section 523(a)(11). "It is a well recognized principle in bankruptcy law that exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor. This is based on the strong policy of the Bankruptcy Code of providing a debtor with a 'fresh start.' " *In re Marvin,* 139 B.R. 202, 205 (Bankr.E.D.Wis.1992) (citing *Gleason v. Ihaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). Given this well-recognized principle, and the split of authority concerning whether a "defalcation" may result from negligence, we cannot say that Congress intended for a debt arising from a mere negligent breach of fiduciary duty to be excepted from discharge under section 523(a)(11).

The FDIC's complaint does not use the magic words "willful" or "reckless." Nonetheless, we believe that it does allege more than a mere negligent breach of fiduciary duty. For instance, the complaint alleges that:

Despite receiving repeated admonitions and warnings against such practices from federal and state banking authorities and other persons who reviewed the Bank's procedures, and in contravention of the Bank's own policies, defendants approved and disbursed loans without adequate underlying information, or supervised and thereby permitted the approval and disbursal of loans without adequate information about the borrower, guarantor and/or the potential collateral. In this manner, loans were approved and disbursed without the following:
  (i) completion of applications;
  (ii) receipt of financial statements or other required credit information;
  (iii) attempts to verify the accuracy of informa-

tion submitted;
  (iv) undertaking or receiving the results of independent credit checks;
  (v) performance of independent appraisals or other means of confirming the alleged value of proffered collateral;
  (vi) ordering or receiving the results of title searches of assets to be pledged as collateral; and
  (vii) maintaining current financial information; and
  (viii) making loans without adequate margin of security.

We must accept as true the FDIC's allegation that Rigdon was told before he undertook these actions that they were impermissible. Therefore, the FDIC's complaint does allege that Rigdon "knowingly" breached his fiduciary duty to the Bank. Since a knowing breach of fiduciary duty is more culpable than a mere negligent breach of duty, we conclude that the FDIC's complaint does allege a "defalcation" as that term is used in section 523(a)(11).

*Conclusion*

The decision of the district court, affirming the bankruptcy court's disposition, is AFFIRMED.

C.A.7 (Ill.),1994.
Meyer v. Rigdon
36 F.3d 1375, 26 Bankr.Ct.Dec. 117, Bankr. L. Rep. P 76,119

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

156 F.3d 598                                                                                    Page 1
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

Matter of Miller
C.A.5 (Tex.),1998.

United States Court of Appeals,Fifth Circuit.
In the Matter of William L. MILLER, Debtor.
William L. MILLER, Appellant,
v.
J.D. ABRAMS INCORPORATED, Appellee.
**No. 97-50842.**

Sept. 24, 1998.

Judgment creditor brought adversary proceeding to obtain determination that state court judgment against Chapter 7 debtor for misappropriation of proprietary information or misuse of trade secrets was nondischargeable debt. Judgment creditor moved for summary judgment. The Bankruptcy Court granted motion. Parties cross-appealed. The United States District Court for the Western District of Texas, Sam Sparks, J., affirmed. Debtor appealed. The Court of Appeals, Patrick E. Higginbotham, Circuit Judge, held that: (1) jury's finding, in state court action, that debtor did not breach fiduciary duty was issue preclusive with respect to whether debt fell within fiduciary fraud or defalcation discharge exception; (2) state court judgment did not have collateral estoppel effect for purposes of determining dischargeability under embezzlement discharge exception; (3) state court judgment did not have collateral estoppel effect as to dischargeability under willful and malicious injury discharge exception; and (4) for dischargeability purposes, injury is "willful and malicious" when there is either an objective substantial certainty of harm or a subjective motive to cause harm.

Reversed and remanded.

West Headnotes

**[1] Bankruptcy 51 ⇐3782**

51 Bankruptcy
    51XIX Review

51XIX(B) Review of Bankruptcy Court
51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Court of Appeals reviews summary judgment rulings de novo, applying the same standards as did the lower courts.

**[2] Bankruptcy 51 ⇐3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Court of Appeals reviews de novo a court's decision to give full faith and credit to state court judgment.

**[3] Federal Courts 170B ⇐420**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk420 k. Judgments. Most Cited Cases
Texas rules of preclusion applied to determination of collateral estoppel effect of state court judgment on nondischargeability of resulting judgment debt. Bankr.Code, 11 U.S.C.A. § 523; 28 U.S.C.A. § 1738.

**[4] Judgment 228 ⇐720**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k. Matters Actually Litigated
and Determined. Most Cited Cases

**Judgment 228 ⇐724**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                         Page 2
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

228k723 Essentials of Adjudication
228k724 k. In General. Most Cited Cases
Under Texas law, collateral estoppel bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action.

**[5] Judgment 228 ⚖️634**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(A) Judgments Conclusive in Gener- al
228k634 k. Nature and Requisites of Former Adjudication as Ground of Estoppel in General. Most Cited Cases
Under Texas law, a party seeking to invoke the doctrine of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action, (2) those facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action.

**[6] Judgment 228 ⚖️713(1)**

228 Judgment
228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k713 Scope and Extent of Estoppel in General
228k713(1) k. In General. Most Cited Cases
Scope of the collateral estoppel doctrine is circumscribed by the particularized findings of the jury.

**[7] Judgment 228 ⚖️828.21(2)**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.21 Particular Federal Proceedings

228k828.21(2) k. Bankruptcy. Most Cited Cases
Jury's finding, in former employer's state court action, that Chapter 7 debtor did not breach any fiduciary duty owed to former employer was issue preclusive with respect to whether debtor committed fraud or defalcation while acting in a fiduciary capacity for purposes of determining dischargeability of state court judgment debt, inasmuch as narrower federal standard would never identify "fiduciary" where Texas law would not. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**[8] Bankruptcy 51 ⚖️3376(3)**

51 Bankruptcy
51X Discharge
51X(C) Debts and Liabilities Discharged
51X(C)5 Torts and Crimes
51k3376 Fraud or Defalcation in Fiduciary Capacity
51k3376(2) Fiduciaries and Fiduciary Capacity
51k3376(3) k. In General. Most Cited Cases
(Formerly 51k3357(2.1))
Definition of "fiduciary" under discharge exception for fraud or defalcation in fiduciary capacity is controlled by federal common law. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**[9] Judgment 228 ⚖️828.21(2)**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.21 Particular Federal Proceedings
228k828.21(2) k. Bankruptcy. Most Cited Cases
Jury's finding, in former employer's state court action, that Chapter 7 debtor acted wrongfully in misappropriating or misusing former employer's proprietary information did not include finding of fraudulent intent, nor did judgment entered on ver-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                           Page 3
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

dict against debtor, in that intent was not essential to judgment; judgment thus did not have collateral estoppel effect for purposes of determining dischargeability under embezzlement discharge exception. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**[10] Bankruptcy 51 ⟹3375**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3375 k. Larceny or Embezzlement.
Most Cited Cases
    (Formerly 51k3356)
For purposes of discharge exception, "embezzlement" is defined as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**[11] Bankruptcy 51 ⟹2363.1**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction and Stay
        51IV(A) In General
            51k2363 Protection Against Discrimination or Collection Efforts in General; "Fresh Start."
                51k2363.1 k. In General. Most Cited Cases

**Bankruptcy 51 ⟹3341**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)1 In General
                51k3341 k. In General. Most Cited Cases
Discharge exceptions are to be narrowly construed in favor of the debtor, inasmuch as the aim of the Bankruptcy Code is to give the debtor a fresh start. Bankr.Code, 11 U.S.C.A. § 523(a).

**[12] Bankruptcy 51 ⟹3375**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
                51k3375 k. Larceny or Embezzlement.
Most Cited Cases
    (Formerly 51k3356)
To meet the definition of "embezzlement" for purposes of discharge exception, there must be proof of the debtor's fraudulent intent in taking the property. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**[13] Bankruptcy 51 ⟹3374(2)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
             51k3374 Willful or Malicious Injury
                51k3374(2) k. Willful, Deliberate, or Intentional Injury. Most Cited Cases
    (Formerly 51k3355(1.10))

**Bankruptcy 51 ⟹3374(4)**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)5 Torts and Crimes
             51k3374 Willful or Malicious Injury
                51k3374(4) k. Knowledge; Knowing Disregard. Most Cited Cases
    (Formerly 51k3355(1.20))
Either objective substantial certainty that injury will result or subjective motive to inflict injury will satisfy "willful injury" requirement of discharge exception for willful and malicious injury. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

**[14] Judgment 228 ⟹828.21(2)**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
            228k828.21 Particular Federal Proceed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                                  Page 4
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
(Cite as: 156 F.3d 598)

ings
      228k828.21(2) k. Bankruptcy. Most Cited Cases
Issue of whether Chapter 7 debtor acted in manner at least substantially certain to result in injury to former employer when he misappropriated or misused former employer's proprietary information was not decided in former employer's state court action against debtor, and therefore collateral estoppel did not apply to preclude litigation as to whether judgment debt fell within discharge exception for willful and malicious injury; jury found that debtor did not act with malice and determined only that injury was proximately caused by debtor's acts. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

[15] Bankruptcy 51 &#x21E8;3374(5)

51 Bankruptcy
    51X Discharge
      51X(C) Debts and Liabilities Discharged
        51X(C)5 Torts and Crimes
          51k3374 Willful or Malicious Injury
            51k3374(5) k. Malice; Malicious Injury. Most Cited Cases
    (Formerly 51k3355(1.25))
Meaning of term "malicious" as used in discharge exception for willful and malicious injury is controlled by federal law, rather than state law. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

[16] Bankruptcy 51 &#x21E8;3374(2)

51 Bankruptcy
    51X Discharge
      51X(C) Debts and Liabilities Discharged
        51X(C)5 Torts and Crimes
          51k3374 Willful or Malicious Injury
            51k3374(2) k. Willful, Deliberate, or Intentional Injury. Most Cited Cases
    (Formerly 51k3355(1.10))

Bankruptcy 51 &#x21E8;3374(4)

51 Bankruptcy
    51X Discharge

51X(C) Debts and Liabilities Discharged
    51X(C)5 Torts and Crimes
      51k3374 Willful or Malicious Injury
        51k3374(4) k. Knowledge; Knowing Disregard. Most Cited Cases
    (Formerly 51k3355(1.20))
For dischargeability purposes, injury is "willful and malicious" when there is either an objective substantial certainty of harm or a subjective motive to cause harm. Bankr.Code, 11 U.S.C.A. § 523(a)(6).

*600 C. Daniel Roberts, C. Daniel Roberts & Associates, Austin, TX, for Appellant.
R. Mark Dietz, Jerry Lee Jarrard, Jr., Dietz & Associates, Round Rock, TX, David Howard Donaldson, Jr., George, Donaldson & Ford, Austin, TX, for Appellee.

Appeal from the United States District Court for the Western District of Texas.

Before REYNALDO G. GARZA, HIGGINBOTHAM and EMILIO M. GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:
    Miller appeals the district court's order holding that the state court judgment debt Miller owes J.D. Abrams, Inc., is nondischargeable in bankruptcy. More specifically, Miller contests the district court's conclusion that he is precluded under the doctrine of collateral estoppel from trying in the bankruptcy court the issue necessary to decide the dischargeability question. We conclude that neither the state court jury nor the state trial judge in entering judgment on the verdict decided Miller's intent in misappropriating or misusing Abrams's proprietary information. We REVERSE the district court's judgment and REMAND for further proceedings.

I

    Abrams, a successful Texas highway and road contractor, employed Miller from June 1985 until February 28, 1994, when Miller left his position as vice president and director at Abrams to become

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                                              Page 5
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

manager and chief operations officer of Belfour Beatty, Inc.'s highway division. In his position at Abrams, Miller was privy to proprietary information and trade secrets regarding such matters as management policies, customer lists, pricing and bidding strategies, and profit margins and cost projections on specific projects. Belfour, wanting to start a competing highway division, started recruiting Miller. During a series of meetings concerning his prospective employment, Miller disclosed**601** confidential information and trade secrets of Abrams to Belfour agents. Based on the information Miller divulged and his twenty years of experience in the road construction industry, Belfour offered Miller the COO position. Other employees of Abrams accompanied Miller in his move to Belfour.

On April 18, 1994, Abrams filed suit in Texas state court against Miller and Belfour. The case was tried to a jury in November 1995. The jury found that Miller misappropriated proprietary information or misused trade secrets and awarded Abrams damages of $1 million. The jury also decided that Miller had not breached any fiduciary duties owed Abrams and that punitive damages were not appropriate, since Miller did not act with "malice mean[ing] ill will, evil motive, or flagrant disregard for the rights of others."

Miller filed a voluntary Chapter 7 bankruptcy petition seeking protection from the state court judgment. Abrams instigated an adversary proceeding to obtain a determination that the state court judgment was a nondischargeable debt under 11 U.S.C. §§ 523(a)(4) and 523(a)(6). Based on the doctrine of collateral estoppel, the bankruptcy court granted summary judgment in favor of Abrams. The state court judgment, it found, was nondischargeable under § 523(a)(4) since misappropriation of proprietary information was larceny per se. The bankruptcy court, however, declined to rest its summary judgment on § 523(a)(6), because the court believed that the state court jury had not decided whether Miller had inflicted a "willful and malicious injury," the requirement for nondis-

chargeability under that section. Miller and Abrams both appealed.

The district court affirmed the judgment that the state court judgment was nondischargeable based on principles of collateral estoppel. The district court, after analyzing the § 523(a)(6) issue, stated that "[t]he bankruptcy judge was correct in finding that the judgment debt was nondischargeable on behalf of Miller by collateral estoppel." As we explained, the bankruptcy judge did not rest its grant of summary judgment upon § 523(a)(6). From context, though, it is clear that the district court found that the debt was also nondischargeable under § 523(a)(4). In doing so, the district court pointed to the jury's finding that Miller had misappropriated proprietary information or misused trade secrets for his own advantage to the detriment of Abrams. The district court believed that this finding conclusively determined that Miller had inflicted a "willful and malicious injury" on Abrams for purposes of § 523(a)(6).

The district court also stated that "[t]he bankruptcy judge was further correct in failing to find the nondischargeability of the judgment debt pursuant to 11 U.S.C. § 523(a)(4) and was correct in overruling all of the contentions with the appellant Miller with regard to his contentions on finding the judgment debt dischargeable based upon collateral estoppel." The efforts to parse the language of the district court aside, it is clear that the judgment entered by the district court found the state court judgment to be a nondischargeable debt.

We have jurisdiction under 28 U.S.C. § 158(d).

## II

[1][2] We review summary judgment rulings *de novo* applying the same standards as did the lower courts. *See In re Hudson,* 107 F.3d 355, 356 (5th Cir.1997). We also review *de novo* a " 'court's decision to give full faith and credit to [a] state court judgment.' " *In re Garner,* 56 F.3d 677, 679 (5th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                           Page 6
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

Cir.1995) (quoting *Sanders v. City of Brady,* 936 F.2d 212, 217 (5th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 748 (1991)).

[3][4] Since the judgment against Miller was rendered by a Texas state court, this court must apply Texas rules of preclusion. *See* 28 U.S.C. § 1738 (full faith and credit statute); *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *In re Garner,* 56 F.3d at 679. "Under Texas law, collateral estoppel 'bars relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action.' " *In re Garner,* 56 F.3d at 679*602 (quoting *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984)).

[5] Further, Texas law requires that:
A party seeking to invoke the doctrine of collateral estoppel must establish (1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.

*Id.* at 680 (quoting *Bonniwell,* 663 S.W.2d at 818). Miller and Abrams agree that requirement (3) is met, but disagree on the degree to which the issue of Miller's intent was litigated in and essential to the state court action.

[6] The scope of the collateral estoppel doctrine is circumscribed by the particularized findings of the jury. *See Marine Shale Processors, Inc. v. EPA,* 81 F.3d 1371, 1379 (5th Cir.1996) (Higginbotham, J.). In this case, the jury specifically answered in the affirmative, with respect to Miller, the question: "Did any of the defendants misappropriate proprietary information or make an improper use of the trade secrets of J.D. Abrams, Inc.?" Misappropriation was defined as the "wrongful taking and use of another's property." The jury answered in the negative whether Miller had acted with "malice mean[ing] ill will, spite, evil

motive, or flagrant disregard for the rights of others." Based on these answers, we must decide whether the jury decided whether Miller acted with the mental state required to satisfy either § 523(a)(4) or § 523(a)(6). We conclude that it made no such decision.

### III

Under 11 U.S.C. § 523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" may not be discharged in bankruptcy. In construing this section, this court has stated that this discharge exception "was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *In re Boyle,* 819 F.2d 583, 588 (5th Cir.1987).

[7][8] The jury found that Miller had not breached any fiduciary duty owed Abrams. While the definition of "fiduciary" under § 523(a)(4) is controlled by federal common law rather than Texas law, it is clear that the federal common law definition is even narrower than the Texas definition. As this court noted recently, "[T]he concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law. Under § 523(a)(4), 'fiduciary' is limited to instances involving express or technical trusts." *Texas Lottery Comm'n v. Tran,* 151 F.3d 339, 342 (5th Cir.1998). The instruction given to the jury in the state case here was far broader, noting that "implicit in this duty is that an officer or director may not serve his own personal interest at the expense of the corporation and its stockholders." Because the federal standard will never identify a "fiduciary" where Texas law would not, the state court judgment is issue preclusive with respect to whether there was "fraud or defalcation while acting in a fiduciary capacity."

[9][10] The § 523(a)(4) exception to discharge,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598

Page 7

156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

however, may still apply here if Miller's actions constitute "embezzlement" or "larceny." Since Miller came into possession of Abrams's proprietary information and trade secrets lawfully, embezzlement, rather than larceny, is the § 523(a)(4) term which applies. *See Great Am. Ins. Co. v. Graziano (In re Graziano),* 35 B.R. 589, 594 (Bkrtcy.E.D.N.Y.1983). Embezzlement is defined for purposes of § 523(a)(4) as the " 'fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.' " *Greyhound Lines Inc. v. Thurston (In re Thurston),* 18 B.R. 545, 550 (Bkrtcy.M.D.Ga.1982) (quoting 3 Collier on Bankruptcy ¶ 523.14(3), 523-106 (15th ed.1981)).

[11][12] The discharge exceptions are to be narrowly construed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start. *See Tran,* 151 F.3d 339, 342. To meet the definition of "embezzlement," there must be proof of the debtor's*603 fraudulent intent in taking the property. *See Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1173 (6th Cir.1996) ("A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud."); *In re Sokol,* 170 B.R. 556, 560 (Bankr.S.D.N.Y.1994); *cf. Coburn Co. v. Nicholas,* 956 F.2d 110, 111 (5th Cir.1992) (requiring an intent to defraud for a determination of whether there has been a breach of a fiduciary relationship under § 523(a)(4)).

The jury's finding that Miller acted wrongfully in misappropriating or misusing Abrams's proprietary information does not include a finding of fraudulent intent. One can wrongfully appropriate a trade secret while acting under an erroneous belief of entitlement. The question to the jury did not decide intent. Nor did the judgment entered on the verdict since intent was not essential to the judgement. Without such a finding by the state courts, there is no preclusion.

## IV

Under the Bankruptcy Code, a debtor may not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Although we will ultimately conclude that under recent Supreme Court precedent, "willful and malicious injury" is a unitary concept entailing a single two-pronged test, courts have previously analyzed "willful" and "malicious" separately. We thus consider them here in turn.

## A.

The Supreme Court recently answered the "pivotal question" of whether § 523(a)(6) covers "acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury." *Kawaauhau v. Geiger,* 523 U.S. 57, ----, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The Court's conclusion was that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Id.* This conclusion was similar to one that the Fifth Circuit had reached in analyzing § 523(a)(6). In *Corley v. Delaney (In re Delaney),* 97 F.3d 800 (5th Cir.1996), this court reaffirmed its earlier holding that "for willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted" and not just performed an intentional act that resulted in injury. *Id.* at 802.

Before we can determine whether the findings of the jury in the state court conclusively determine whether Miller inflicted a "willful ... injury," we must grasp the Supreme Court's insistence on "actual intent to cause injury." The Supreme Court's disposition in *Kawaauhau* certainly eliminates the possibility that "willful" encompasses negligence or recklessness. *See Kawaauhau,* 523 U.S. at ----, 118 S.Ct. at 978 ("We hold that debts arising from recklessly or negligently inflicted injuries do

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not fall within the compass of § 523(a)(6).").

[13] At least three remaining readings are possible. The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury. We hold that the label "intentional tort" is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6).

If "actual intent to cause injury" and intentional torts were parallel terms, issue preclusion with respect to willfulness would apply in favor of Abrams. This is because misappropriation of proprietary information and misuse of trade secrets are generally considered to be intentional torts. *See, e.g., Micro Data Base Sys., Inc. v. Dharma Sys., Inc.,* 148 F.3d 649, 653-54 (7th Cir.1998) (Posner, C.J.) ("The misappropriation of a trade secret is an intentional tort."); *Restatement (Third) Unfair Competition* § 40(b) (defining the scienter requirement for misuse of trade secrets); *see also Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 769 (1958)**\*604** (relying on a similar predecessor Restatement definition in defining misuse of trade secrets); *American Derringer Corp. v. Bond,* 924 S.W.2d 773, 777 (Tex.App.-Waco 1996, no writ) (following *Hyde* ).

The category of intentional torts, however, is broader. The Supreme Court did specifically refer to intentional torts, noting that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *Kawaauhau,* 523 U.S. at ----, 118 S.Ct. at 977. This acknowledgment of a logical association, however, avoids equating § 523(a)(6) torts and intentional torts, and with good reason.

Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful. This case illustrates the distinc-

tion, since misappropriation of proprietary information and misuse of trade secrets are wrongful regardless of whether injury is substantially certain to occur. *See, e.g., Restatement (Third) Unfair Competition* § 40(b) cmt. c ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner *or* enrichment to the defendant is a 'use' under this section."). Misuse of trade secrets is not precisely like stealing funds from a till, because the tortfeasor's gain is not inevitably a loss to the legal owner of the secret.

Most often, an intentional tort requires either objective substantial certainty of harm or subjective motive to do harm. Indeed, the presence of one of these factors is both necessary and sufficient for a tort to be classified as an "intentional tort" under the traditional modern definition. *See* Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort,* 19 Hofstra L.Rev. 447, 447 (1990) (describing "intentional torts" as those where "the defendant acted with the intent to injure the plaintiff or with substantial certainty that his action would injure the plaintiff").

Thus, rather than allow the general classification of a tort to be a talisman, we hearken back to this original definition of "intentional tort" to determine whether injury is "willful" for § 523(a)(6) purposes. This test is fully consistent with our precedent. *Delaney,* which remains good law because the Supreme Court in no way contradicted it, equated intending actual injury to a situation in which "the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *Delaney,* 97 F.3d at 802. Although *Delaney* did not address whether a subjective motive to injure would alternatively be sufficient to trigger § 523(a)(6), it would seem peculiar to deem an action causing injury not "willful" when the tortfeasor's action was in fact motivated by a desire to cause injury.

[14] Applying this test, we find that willful injury was not decided in the state court suit. If the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                    Page 9
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

subjective standard alone were the standard, issue preclusion would give Miller victory because the jury found that he did not act with "malice," defined by the court to include "evil motive." Miller's conduct, however, could still be "willful" under the objective standard, if his acts were substantially certain to result in injury to Abrams. The state court jury determined only that injury was proximately caused by Miller's acts, a less demanding standard than "substantial certainty."

### B.

[15] Miller's claim of preclusion might still seem to be vital, because § 523(a)(6) requires "willful *and malicious* injury" (emphasis added). If Miller could establish that the state court decided that his acts were not "malicious," § 523(a)(6) would not bar discharge ability. At first glance, Miller might appear to meet this burden, since the jury found no act of malice by Miller in determining whether to assess punitive damages. Unfortunately for Miller, however, the meaning of "malicious" in § 523(a)(6) is controlled by federal law rather than state law. To determine whether the definitions are sufficiently similar that the trial of one is a trial of the other requires that we define "malicious."

The law outside the Fifth Circuit concerning the meaning of "malicious" in § 523(a)(6) has long been confused. *See generally Firstmark Fin. Corp. v. Aldrich (In re Aldrich)*, 37 B.R. 860, 862-64 (Bankr.N.D.Ohio); **\*605** Charles Jordan Tabb, *The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate,* 59 Geo. Wash. L.Rev. 56, 61-89 (1990); Karen N. Fischer, Comment, *The Exception to Discharge for Willful and Malicious Injury: The Proper Standard for Malice,* 7 Bankr.Dev. J. 245, 248-59 (1990).

Courts have divided roughly into two camps, some requiring "special malice," which requires a showing of a motive to harm, and others requiring merely "implied malice." *Compare, e.g., American Savings & Loan Ass'n v. Weber (In re Weber)*, 99 B.R. 1001, 1014-15 (Bankr.D.Utah 1989) (requiring special malice), *and Grand Piano & Furniture Co. v. Hodges (In re Hodges),* 4 B.R. 513, 516 (Bankr.W.D.Va.1980) (same), *with United Bank v. Nelson,* 35 B.R. 766, 774 (N.D.Ill.1983) (requiring "implied malice"), *and United Va. Bank v. Fussell (In re Fussell),* 15 B.R. 1016, 1022 (W.D.Va.1981) (same). The difference in opinion has been whether § 523(a)(6) repudiated an implied malice test previously established in *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904).

The Fifth Circuit so far has taken a clear path, albeit without analysis of the confused jurisprudence. *Vickers v. Home Indem. Co.,* 546 F.2d 1149 (5th Cir.1977), defined "malicious" as " 'without just cause or excuse.' " *Id.* at 1150 (quoting 1A Collier, Bankruptcy ¶ 17.17, at 1650.4 to 1650.6 (1976)); *see also Corley v. Delaney (In re Delaney),* 97 F.3d 800, 802 n. 6 (5th Cir.1996); *Seven Elves, Inc. v. Eskenazi,* 704 F.2d 241, 245 (5th Cir.1983); *Petty v. Dardar (In re Dardar),* 620 F.2d 39, 40 (5th Cir.1980).

This test is thus a species of "implied malice," because no bad motive on the part of the debtor is required. *See, e.g., Black's Law Dictionary* 958 (6th ed.1990) (defining "implied malice" for general purposes as "[m]alice inferred by legal reasoning and necessary deduction from the res gestae or the conduct of the party."). Other courts, however, have defined "implied malice" differently. *See, e.g., In re Nance,* 556 F.2d 602, 611 (1st Cir.1977) ( "There need be no showing of 'special malice' toward the injured party, only that the act is done deliberately and intentionally, in knowing disregard of the rights of another.") (internal quotation marks omitted). This definition makes the "implied malice" inquiry quite close to that of the *Kawaauhau* standard for "willful ... injury."

Ordinarily, of course, this court would be bound to its precedent, and thus would retain the "just cause or excuse" definition. The Supreme

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598                                                                                                                          Page 10
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

Court's decision in *Kawaauhau,* however, has displaced it. The origin of the "just cause or excuse" standard is *Tinker,* 193 U.S. at 487, 24 S.Ct. 505, but the *Kawaauhau* Court, after specifically quoting the "just cause or excuse" and other language, criticized that opinion as failing to produce a clear standard. *See* 523 U.S. at ----, 118 S.Ct. at 978 ("The exposition in the *Tinker* opinion is less than crystalline."). More importantly, the *Kawaauhau* Court explicitly confined the holding of *Tinker* to the collateral proposition that criminal conversation is an intentional tort. *See id.*

Thus, the roots of the "just cause or excuse" standard that this court has adopted have now been cut off. The most obvious candidates are the "special malice" and the "implied malice" standards on which most courts have focused. The "special malice" standard has been criticized for "appear[ing] to abolish section 523(a)(6) of the Code as a meaningful ground of nondischargeability." *Citizens Bank & Trust Co. v. Lewis (In re Lewis),* 17 B.R. 46, 48 (Bankr.W.D.Ark.1981). While a special malice standard might still have bite for judgments involving torts like battery, it would make nondischargeability unnecessarily rare, as judgments for torts substantially certain or certain to result in injury would be discharged when a tortfeasor was merely indifferent to the injury and not acting with the end goal of causing that injury.

The implied malice standard is thus preferable. This still leaves the question of which variant of the implied malice definition is appropriate. "Without just cause or excuse" might serve as a useful general definition of implied malice, and it might have been an appropriate definition when it appeared that "willful ... injury" might include negligent acts or acts based on mistakes of fact. This is because when a tort does not involve intentional \*606 injury to another, then it might in some circumstances be justified or excused. *See, e.g., Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 79 L.Ed. 393 (1934) ("There may be an honest, but mistaken belief engendered by a course of dealing,

that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.").

The "just cause or excuse" approach is peculiarly inappropriate, however, given the Supreme Court's definition of "willful ... injury" in *Kawaauhau.* Where injury is intentional, as it now must be under *Kawaauhau,* it cannot be justified or excused. Eliminating the "just cause or excuse" exception would not ensnare those who have acted under "an honest, but mistaken belief." Such an individual cannot be said to have intentionally caused injury, since legally cognizable injury would not meet the test of "not substantially certain to result," in the absence of the fact about which there has been mistake.

[16] Thus, we adopt the alternative definition of "implied malice." Because this standard is synonymous to the *Kawaauhau* standard for "willful injury," "acts done with the actual intent to cause injury," *id.* at ----, 118 S.Ct. at 975, we hold that this is the test for "willful and malicious injury" under § 523(a)(6). Thus, we hold that an injury is "willful and malicious" where there is either an objective substantial certainty of harm or a subjective motive to cause harm.

*Kawaauhau* does not foreclose, even encourages, this approach. That case never makes explicit whether it is analyzing solely the "willful" prong or the "willful and malicious" standard as a unit. Aggregating "willful and malicious" into a unitary concept might be inappropriate if the word they modified were "act," but treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is "injury."

It is worth noting that this interpretation of § 523(a)(6) comes quite close to that recommended by commentators who, pre-*Kawaauhau,* have considered the definition of "malicious." *See* Tabb, *supra,* at 104 (propounding a "knowing violation" test, wherein the debtor must have been aware that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553
**(Cite as: 156 F.3d 598)**

its act violated the legal rights of the creditor); Fischer, *supra,* at 258-59 ("The critical inquiry under this standard is whether the debtor knew, or should have known, that his actions would cause harm to the creditor.").

Applying this analysis to the instant case is straightforward. The word "malicious" does not change the conclusion. Thus, on the § 523(a)(6) claim, we find that issue preclusion does not apply in favor of either party. If Miller's actions were at least substantially certain to result in injury to Abrams, then the debt is nondischargeable under § 523(a)(6). Otherwise, neither the objective nor the subjective standard is met, and the debt is dischargeable.

V

Since the jury's findings in the state court did not speak to whether Miller acted with fraudulent intent or the objective probability of injury from Miller's tortious acts, the parties are free to try this issue for the first time. Accordingly, we REVERSE the district court's judgment and REMAND for proceedings consistent with this opinion, including entry of summary judgment on the facts if appropriate.

C.A.5 (Tex.),1998.
Matter of Miller
156 F.3d 598, 33 Bankr.Ct.Dec. 282, Bankr. L. Rep. P 77,805, 48 U.S.P.Q.2d 1293, 12 Tex.Bankr.Ct.Rep. 553

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.